UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL
ADVOCATES, a non-profit corporation,

        Plaintiff,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, a United States
Government Agency; NATIONAL MARINE
FISHERIES SERVICE, a part of the National
Oceanic and Atmospheric Administration, a
part of the United States Department of
Commerce; UNITED STATES FISH AND
WILDLIFE SERVICE, a part of the United
States Department of the Interior,

        Defendants,

STATE OF OREGON; and NORTHWEST
PULP AND PAPER ASSOCIATION,

        Intervenor-Defendants.

Civil No.  05-1876-HA

OPINION AND ORDER

HAGGERTY, Chief Judge:

     Plaintiff challenges decisions made by federal agencies about water quality standards for

the State of Oregon.  Before the court in this administrative review are plaintiff's Motion to

1    - OPINION AND ORDER

Complete Administrative Records [85], (Alternative) Motion for Leave to Take Discovery [86], and Motion to Supplement Administrative Records [125]. After considering the arguments and evidence before the court, the Motion to Complete Administrative Records [85] is granted, the (Alternative) Motion for Leave to Take Discovery [86] is denied, and the Motion to Supplement Administrative Records [121] is denied without prejudice.

## I.   BACKGROUND

Plaintiff is a non-profit environmental organization. It challenges three federal agency decisions related to water quality standards for the State of Oregon: the Environmental Protection Agency's (EPA) approval of those water quality standards; and the Fish and Wildlife Service's (FWS) and National Marine Fisheries Service's (NMFS) separate findings that the standards were not likely to jeopardize threatened and endangered species.

### 1.   Decisions at Issue

The Clean Water Act requires that states promulgate water quality standards governing intrastate waterways. 33 U.S.C. § 1313(a). Those standards are subject to review by the EPA and must be renewed and revised at least every three years. *Id.* § 1313(c). State water quality standards promulgated after May 30, 2000, do not become effective until the EPA has approved them. 40 C.F.R. § 131.21(c). The Endangered Species Act further requires that in the process of evaluating and vetting state water quality standards, the EPA consult with the relevant services about any potential impact on endangered species and habitats. 16 U.S.C. § 1536. Formal consultation with the services results in the issuance of a "biological opinion" on detrimental impact to endangered species. 40 C.F.R. § 402.14(h)(3).

The Oregon Department of Environmental Quality submitted proposed water quality standards to the EPA for review in December 2003. Gearheard Decl. ¶ 5. The proposed

2    - OPINION AND ORDER

standards include limits on water temperature, among other things. *Id.* As part of its review, the EPA consulted with the FWS and NMFS on endangered species issues. *Id.* ¶ 7. The NMFS issued a biological opinion to the EPA on February 23, 2004. NMFS 2 (NMFS Opinion).[1] The FWS issued a biological opinion to the EPA on February 24, 2004. FWS 2 (FWS Opinion). On March 2, 2004, the EPA issued a letter approving the standards. Gearheard Decl. ¶ 8. The letter was accompanied by a 110-page attachment titled "Support Document for EPA's Action Reviewing New Or Revised Water Quality Standards for the State of Oregon." EPA 1, Attach. 1 (EPA Support Document).

### 2. The Temperature Guidance

Plaintiff argues that the NMFS Opinion, FWS Opinion, and the EPA Support Document all rely in large part on a fourth document: the EPA Region 10 Guidance for Pacific Northwest State and Tribal Temperature Water Quality Standards. EPA 104 (Temperature Guidance). "The Temperature Guidance was developed based on an extensive review of scientific research, substantial involvement of other federal agencies and State and tribal governments, and public comment." Gearheard Decl. ¶ 10. It endorses specific methods for calculating daily average temperatures and includes extensive discussion of specific temperature recommendations for Pacific Northwest coldwater salmonids. The Temperature Guidance suggests that adopting its recommendations would lead to fast-track approval of proposed standards:

> EPA action on [water quality standards] that are consistent with [the Temperature Guidance] is expected to be significantly expedited because the scientific rationale in support of the [water quality standards] would in large part already be described and supported by the EPA, and by the [NMFS] and [FWS]. However, because this is a guidance document and not a regulation, EPA cannot bind itself to approve a [water quality standard] submission that follows the recommendation of this guidance. . . . So, even though EPA expects the review process to be

---

[1] The EPA, FWS, and NMFS each submitted an administrative record. The administrative record submitted by each agency is referred to in citations by the initials of the relevant agency.

3    - OPINION AND ORDER

>significantly expedited if this guidance is followed, EPA and the Services must still examine every [water quality standard] submission on a case-by-case basis, taking into consideration any public comments received or other new information.

Temperature Guidance at 1. While the Temperature Guidance and documents directly cited therein are included as part of the EPA record, not all documents considered during the process of developing the Temperature Guidance have been included. Gearheard Decl. ¶ 10; Keenan Decl. ¶ 20. The EPA asserts that some documents "pertain[ing] solely to the process of developing the Temperature Guidance . . . were not considered (directly or indirectly) in EPA's approval decision of March 4, 2004." Keenan Decl. ¶ 20.

## II.    SUPPLEMENTING THE RECORD

Plaintiff seeks judicial review of decisions by defendants. In evaluating the propriety of such agency decisions, this court must examine the "whole record or those parts of it cited by a party." 5 U.S.C. § 706. Plaintiff raises two reasons for broadening the scope of material considered in evaluating the merits of this case. First, plaintiff argues that the record is incomplete because documents that *were* before the agency at the time of decision have not been included. Second, plaintiff argues that materials that *were not* before the agency at the time of decision should be considered. These two sets of arguments are raised in two separate motions under the rubrics of "completion" and "supplementation," respectively. For reasons explained below, both are construed as motions to supplement the record.

The Supreme Court has cautioned that "the focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138 (1973)). Despite this bright-line proclamation, the Court recognized that the administrative record may need to be supplemented with material not in the agency-produced record in order to allow review. *See Pitts*, 411 U.S. at 142-43. Since *Pitts*,

4     - OPINION AND ORDER

supplementation has been deemed appropriate and necessary in a number of circumstances "to identify and plug holes in the administrative record." *The Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). District courts, exercising their discretion, may consider materials not included as part of the agency record "(1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.'" *Id.* (quoting *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).[2]

These four categories implicitly include both materials that were and were not before the agency at the time that it made its decision. Plaintiff cites a number of district court opinions that have treated the notion of completing the record as distinct from supplementing the record. But, the Ninth Circuit has eschewed this distinction, and in *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534 (9th Cir. 1993), held that when "the material the environmental groups seek to have included in the record is material that allegedly *was* before the agency . . . supplementation is proper." *Id.* at 1548. Accordingly, this court construes all requests to add materials to the record as governed by the standards for supplementing the record.

### 1. Temperature Guidance Materials

There is no question that the Temperature Guidance was important to the decision process. The EPA Support Document cites the Temperature Guidance extensively, noting, for

---

[2] This standard is analogous to the Tenth Circuit's presumed regularity and completeness of administrative records "absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993).

5     - OPINION AND ORDER

example, that it was "[t]he critical document which provided the basis for [Oregon's] framework to designate salmonid uses . . . and provide[d] the critical informational basis for the specific numeric criteria, the thermal plume, human use allowance, cold water protection, air temp exclusion and natural conditions found in the Oregon rule." EPA Support Document at 88. Similarly, the NMFS Opinion states: "Oregon's revised numeric criteria for temperature are consistent with those in the Temperature Guidance. Therefore, this analysis of effects is based on the scientific information and rationale developed for the Temperature Guidance, including the six technical issues papers." NMFS Opinion at 33. The FWS Opinion also bases its analysis on the conclusions presented in the Temperature Guidance. *See, e.g.*, FWS Opinion at 49-50.

It is apparent from the record that Oregon's proposed standards and the rationales for accepting them largely flow from the Temperature Guidance. It is a very specific document and not a general policy guide. To the extent that the agencies simply rely on the scientific judgments in the Temperature Guidance, it is the agency decision for all practical purpose. As such, any documents considered in creating the Temperature Guidance must be deemed, contrary to the agencies' assertions, to have been "directly or indirectly considered by agency decision-makers . . . ." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989). Accordingly, for this court to evaluate the agency actions at issue here, the record must be supplemented with all documents underlying the development of the Temperature Guidance.

### 2. Other Materials

Plaintiffs seek to supplement the record with a number of other materials that were not before the agencies. Until the record has been supplemented with the documents underlying the Temperature Guidance, it is impossible to evaluate at this time whether some or all of these materials will be redundant or unnecessary. Accordingly, plaintiff's motion is denied without prejudice to renewal after the agencies comply with this Order.

6      - OPINION AND ORDER

### III.     DELIBERATIVE PRIVILEGE

Plaintiff argues that defendants have improperly excluded material from the record under the deliberative process privilege. The deliberative process privilege "was developed to promote frank and independent discussion among those responsible for making governmental decisions, and also to protect against premature disclosure of proposed agency policies or decisions." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citations omitted). To qualify as privileged, a document must "be predicisional–it must have been generated before the adoption of an agency's policy or decision," and "must be deliberative in nature, containing opinions, recommendations, or advice about agency policies." *Id.* The privilege is limited, and may be overcome by a sufficient showing of need for disclosure. *Id.* The government bears the initial burden of establishing that the privilege applies. *See Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 854 (3d Cir. 1995).[3]

Plaintiff does not dispute that the record before the agencies contains materials properly subject to the deliberative process privilege. Rather, plaintiff seeks a detailed privilege log for those materials. This court is mindful that in its review of agency action "inquiry into the mental processes of administrative decisionmakers is usually to be avoided." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). Only when there is "a strong showing of bad faith or improper behavior [should] such an inquiry be made." *Id.* No such showing has yet been made. Materials subject to the deliberative process privilege are likely to be the same sort of documents that this court cannot consider in evaluating agency action. Because the agencies bear the burden of establishing that a privilege applies, they must reveal, through a detailed log,

---

[3] While the procedural posture may be different in cases involving the deliberative process privilege in the context of the Freedom of Information Act or in civil litigation, the privilege itself is identical. *See, e.g.*, *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1116-18 (9th Cir. 1988) (FOIA); *Warner Commc'ns*, 742 F.2d at 1161 (civil litigation).

7      - OPINION AND ORDER

the documents excluded from the record. Absent such a log, plaintiff has no way to challenge assertion of the privilege, and this court has no way to evaluate the claim. Accordingly, the agencies must produce detailed privilege logs for those documents they have excluded from the record under a claim of privilege.

## IV.   CONCLUSION

For the foregoing reasons, the Motion to Complete Administrative Records [85] is GRANTED; the (Alternative) Motion for Leave to Take Discovery [86] is DENIED; and the Motion to Supplement Administrative Records [125] is DENIED WITHOUT PREJUDICE. As required by the operative Scheduling Order [130], the parties shall meet and confer within one week to develop a schedule for compliance with this Order and any further briefing regarding the administrative records. The parties shall file with the court, by February 1, 2008, a joint status report and proposed schedule.

IT IS SO ORDERED.

DATED this  7   day of January, 2008.

 /s/ Ancer L. Haggerty  
Ancer L. Haggerty  
United States District Judge