ALLISON M. LAPLANTE (OSB # 02361)
DANIEL P. MENSHER (OSB # 07463)
DANIEL J. ROHLF (OSB # 990069)
Pacific Environmental Advocacy Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503)768-6894, laplante@lclark.edu
(503)768-6926, dmensher@lclark.edu
(503) 768-6707, rohlf@lclark.edu

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NORTHWEST ENVIRONMENTAL ADVOCATES, a non-profit corporation, | Civil No: 05-1876-HA |
| Plaintiff,<br>v. | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE TO FEDERAL DEFENDANTS' CROSS MOTION ON CLEAN WATER ACT CLAIMS** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, a United States Government Agency, NATIONAL MARINE FISHERIES SERVICE, a part of the National Oceanic and Atmospheric Administration, a part of the United States Department of Commerce, and UNITED STATES FISH AND WILDLIFE SERVICE, a part of the United States Department of the Interior, | **(Oral Argument Requested)** |
| Defendants, and | |

THE STATE OF OREGON, and NORTHWEST
PULP AND PAPER ASSOCIATION

_____ Intervenor-Defendants. _____

## TABLE OF CONTENTS

INTRODUCTION......................................................................................... 1

ARGUMENT..............................................................................................1

I.    EPA Violated the CWA by Failing to Take Action on Oregon's Nonpoint Source
      Exemptions.........................................................................................1

      A.    Oregon's Nonpoint Source Exemptions Are Water Quality Standards....... 2

      B.    EPA Has the Authority to Review Oregon's Nonpoint Source
            Exemptions...............................................................................5

II.   EPA's Approval of the Natural Conditions Criterion Was Unlawful..............7

      A.    EPA's Approval Rests on Faulty Logic and Misplaced Assumptions.........7

      B.    Without Reliable and Accurate Estimates of "Natural" Temperatures EPA's
            Approval is Unsupportable.........................................................9

      C.    EPA's Approval Violates the CWA Review Requirements...........…......11

III.  EPA Arbitrarily and Capriciously Approved Oregon's Numeric Criteria…..13

      A.    EPA's Arguments Are Based on an Improperly Deferential Standard of Review,
            Lack Support in the Record, and Misconstrue
            NWEA's Burden...................................................................…....14

      B.    EPA's Approval of 20°C Criterion Was Arbitrary and Capricious…….....17

      C.    EPA's Approval of Oregon's 12°C Criterion Was Arbitrary and
            Capricious............................................................................20

            1.    The Record Does Not Demonstrate that 12°C Protects All Bull Trout Life
                  Stages...........................................................................21

            2.    The Record Indicates That EPA Based Its Approval on Improper
                  Motivations...............................................................…....23

      D.    EPA's Approval of Oregon's 18°C Criterion Was Arbitrary and Capricious.......24

IV.   EPA's Approval of Oregon's Use Designations Was Arbitrary and
      Capricious...........................................................................................28

A.   This Court Should Reject EPA's Argument that Oregon Should Now Be Allowed to Pick and Choose Where Its Old Designations Applied...................29

B.   EPA's "One Use/One Criterion" Argument Ignores EPA's Own Regulations.........................................................................................30

C.   EPA's Appeal to Best Available Science Must Be Rejected................32

V.   **EPA's Approval of Oregon's Antidegradation Policy and Implementation Methods Was Arbitrary and Capricious........................................34**

A.   Oregon's Antidegradation Policy Does Not Protect Existing Uses..........34

B.   EPA's Approval of Oregon's Antidegradation Implementation Methods Was Arbitrary and Capricious...................................................................36

VI.   **Oregon's Water Quality Standards Do Not Protect Imperiled Species........39**

A.   Risk to Threatened and Endangered Species is a CWA Issue................39

B.   EPA's Decisions Did Not Account for the Vulnerable State of the Species....................................................................................41

**CONCLUSION.............................................................................45**

# TABLE OF AUTHORITIES

**Cases**

*American Wildlands v. Browner*, 260 F.3d 1192 (10th Cir. 2001) .................................................. 5

*Arizona Cattle Growers' Ass'n. v. U.S. Fish & Wildlife Serv.*, 63 F.Supp.2d 1034 (D. Ariz. 1998) ........................................................................................................................... 16

*Arrington v. Daniels*, 516 F.3d 1106 (9th Cir. 2008) ................................................................ 15

*Center for Biological Diversity v. Wagner*, CV No. 08-302-CL, 2009 WL 2176049 (D. Or. June 29, 2009) ........................................................................................................................... 2

*Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070 (11th Cir. 2004) . 3

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....................................................................... 37

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ......................................................... 16

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29 (1983) .................................................. 14

*Nat'l Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982) ............................................. 35

*Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163 (9th Cir. 2004) .............. 16

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (2010) .................................................... 11

*Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d 1259 (D.Or. 2003) ...... 13, 17, 36, 38

*Northwest Environmental Advocates v. EPA*, No. 05-1876-HA, 2008 WL 111054 (D. Or. Jan. 7, 2008) ........................................................................................................................... 15, 29

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) ....................................................... 34

*Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043 (9th Cir. 2008) ........................ 14

*Ohio Valley Environmental Coalition v. Horinko*, 279 F.Supp.2d 732 (S.D.W.Va. 2003) .... 11, 12

*Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002) .................................................................. 5

*PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700 (1994) ............. 35

*Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995) ................................................................. 16

**Statutes**

16 U.S.C. § 1532 .................................................................................................................. 44

**Federal Regulations**

40 C.F.R. § 130.7 ............................................................................................................ 12, 18
40 C.F.R. § 130.17 .......................................................................................................... 28, 44
40 C.F.R. § 131.6 ............................................................................................................ 17, 40
40 C.F.R. § 131.10 .......................................................................................................... passim
40 C.F.R. § 131.11 .......................................................................................................... passim
40 C.F.R. § 131.12 .......................................................................................... 32, 35, 36, 40
40 C.F.R. §131.13 ................................................................................................................. 5
40 C.F.R. § 131.3 ............................................................................................ 28, 31, 40, 44

**Federal Register**

61 Fed. Reg. 41169 ........................................................................................................ 36, 37
62 Fed. Reg. 41162, ....................................................................................................... 30, 41

**State Regulations**

OAR 340-041-0004 ...................................................................................................... 7, 34, 35
OAR 340-041-0028 ....................................................................................................... passim
OAR 340-041-0061 .............................................................................................................. 7

**INTRODUCTION**

Oregon established numeric water quality criteria at or above upper optimal temperatures, applied the most protective criteria to few waters, adopted narrative criteria that serve to wholly override these numeric criteria and allow waters only to get warmer, exempted the primary sources of temperature increases, and otherwise made choices which, at every turn, compounded the risk to vulnerable salmon, steelhead and bull trout. In defense of its decisions to approve Oregon's water quality standards, EPA constructs a house of cards – relying upon assumption after assumption with little support in the record save the agency's prior conclusory statements. In response to NWEA's challenges about EPA's failures to act, EPA constructs a fiction designed to avoid judicial review. EPA maintains that it need not evaluate Oregon's nonpoint source provisions because these exemptions, according to EPA, merely define how logging, grazing and agriculture are to comply with the standards. It likewise argues, despite its regulations and this Court's clear orders, that it was not required to review and approve antidegradation implementation methods for Oregon. This Court should reject EPA's attempts to avoid judicial review entirely, as well as EPA's invitation to limit the Court's review to accepting the agency's conclusions because "scientific" determinations are at issue. NWEA respectfully requests the Court enter summary judgment for NWEA on its Clean Water Act ("CWA") claims[1] and deny EPA's cross motion for summary judgment.

**ARGUMENT**

**I.    EPA Violated the CWA by Failing to Take Action on Oregon's Nonpoint Source Exemptions**

Though "[n]onpoint sources are thought to be the most significant sources of water

---

[1] NWEA refers to the claim numbers in its Second Amended Complaint (Docket # 264), which NWEA filed to conform its pleadings to its motion for summary judgment.

quality impairment in Oregon at this time," (FWS 227 at 04651), EPA has turned a blind eye to Oregon's provisions that exempt these sources from water quality standards, in violation of the CWA. Despite limits on EPA's own regulatory control over nonpoint sources, EPA can and must review a state's water quality standards provisions pertaining to nonpoint sources.

A.    **Oregon's Nonpoint Source Exemptions Are Water Quality Standards**

Oregon's rules effectively eliminate the applicability of water quality standards to nonpoint sources of pollution. EPA and Oregon claim to agree with NWEA that water quality standards should "apply" to all water bodies regardless of the sources of pollution entering the waters. NWEA Br.[2] at 8; EPA Br. at 15 n.7; Or. Br. at 2. They simultaneously refuse to acknowledge, however, that Oregon's logging, grazing, and agriculture provisions *negate the applicability* of water quality standards to those waters primarily polluted by nonpoint sources. While it is true that Oregon assigned numeric criteria to individual waters, it also effectively exempted nonpoint sources from complying with those criteria – thereby leaving the waters without protection from the very sources responsible for the elevated temperatures. This Court should reject the fiction that the standards "apply" when they do not.

Oregon clings to this fiction in its brief by arguing that the nonpoint source provisions are "implementation" requirements rather than water quality standards. Or. Br. at 2-3. Relatedly, EPA argues that rather than being "exemptions," Oregon's nonpoint source provisions actually define what nonpoint sources *must do* "in order to <u>comply</u> with Oregon's water quality standards." EPA Br. at 13 (emphasis in original); *see also id*. at 12. This characterization is inaccurate, to say the least, as both a legal and factual matter. As *Center for Biological Diversity v. Wagner*, CV No. 08-302-CL, 2009 WL 2176049 at *17-18 (D. Or. June 29, 2009),

---

[2] "NWEA Br." means NWEA's (Corrected) Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment on Clean Water Act claims, Docket # 219.

demonstrates, nothing in Oregon's rules actually *requires* activities such as grazing to meet numeric criteria.  Indeed, rather than defining what nonpoint sources "must do to comply" (EPA Br. at 12) with the standards, the rules state what nonpoint sources *do not have to do* vis-à-vis the standards.   Moreover, EPA itself agrees the BMPs referenced in Oregon's rules do not and cannot result in compliance with water quality standards.  *See* NWEA Br. at 11 n.4.[3]

The Court should look to the cases that have been willing to pull back the curtains on this artifice where advanced elsewhere by EPA.  S*ee* NWEA Br. at 11-13.  The only case EPA directly addresses is *Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA*, 386 F.3d 1070 (11th Cir. 2004) ("*FPIRG*").  Contrary to EPA's assertion, however, *FPIRG* does not support EPA's position.  In *FPIRG*, the Eleventh Circuit held that the relevant question was whether the state law "had the practical effect of loosening [state] water quality standards."  *Id.* at 1090-91.  The Eleventh Circuit remanded to the district court to apply this effects-based test.

EPA claims that on remand the district court rejected the Eleventh Circuit's specific articulation of the "effects test."  EPA Br. at 14.  Setting aside whether EPA or the district court was free to disregard the Eleventh Circuit's opinion in any way, the bottom line is that on remand, the district court *did apply* an effects-based test.  *See* EPA Br. Att. 1 at 20 ("While noting the parties' disagreement as to how the Eleventh Circuit's opinion should be interpreted,

---

[3] The Court should reject this artificial distinction between water quality standards and implementation provisions for several additional reasons.  Oregon included these provisions directly in its water quality standards rules and submitted them to EPA for review and approval. Contrary to the position Oregon now takes in this litigation, during the development of the Temperature Guidance, Oregon objected to EPA's suggestion that EPA need not review state nonpoint source provisions.  *See* EPA 605 at 023069.  Moreover, EPA reviewed (and approved) the "Human Use Allowance," and other exemptions, all of which appear in the section entitled "Implementation of Temperature Criteria," alongside the nonpoint source provisions.  *See* OAR 340-041-0028(12).  EPA has provided no rationale for why it considered certain "implementation" provisions water quality standards but not others.

the Court focuses on the Eleventh Circuit's ultimate instruction: . . . whether the [rule], as applied, was an effective change to . . . water quality standards, as applied.").  EPA did not, as it does here, continue to advance an overly simplified bright line rule defining water quality standards.  Rather, after the Eleventh Circuit's decision, EPA conceded that certain rules that affected "what it means to attain or not attain" any water quality standard were themselves water quality standards subject to review.  *Id*. at 14.  Here, Oregon's nonpoint source provisions define "what it means to attain or not attain" water quality standards.  *See, e.g.*, OAR 340-041-0028(12)(e) ("For forest operations . . . water quality standards are intended to *be attained . . . through best management practices*[.] Therefore, forest operations that are in compliance with the Forest Practices Act . . . are . . . deemed in compliance with this rule.") (emphasis added).[4]

Further, EPA's resort to the TMDL[5] process does not save its argument.  EPA notes that if the underlying water quality criteria were exceeded, irrespective of the source of pollution, the response to the exceedance would still be the same – that is, the development of a TMDL.  EPA Br. at 13, n.5.  NWEA agrees.  But, EPA misses NWEA's point.  When Oregon evaluates whether the TMDL it is developing will meet water quality standards, it will apply these nonpoint source provisions.  In other words, if Oregon develops a TMDL for a waterbody impaired only by nonpoint sources, that TMDL need not ensure compliance with numeric criteria because the standards themselves contain the exemptions.  The nonpoint source provisions

---

[4] EPA quotes another excerpt of the test it applied on remand in *FPIRG*, but that quote does not actually help EPA.  EPA Br. at 14 (quoting EPA's position on remand that a rule had the effect of revising a water quality standard when it "defined, changed, or established a level of protection").  The stark reality is that Oregon's provisions do "change[]. . . the level of protection" for a waterbody.  Rather than mandating a particular temperature be achieved, these rules reduce the required "level of protection" to the level of water quality achieved by implementing BMPs established by other agencies with no reference to the numeric criteria.

[5] A Total Maximum Daily Load, or TMDL, is a CWA clean-up plan required for waterbodies that do not meet water quality standards.  *See* 33 U.S.C. § 1313(d)(1)(C).

change the goal established by the standards from "attaining the criteria" to "attaining the criteria only to the extent BMPs established by other agencies allow." By equating BMPs with compliance with numeric criteria, the state has tied its own hands in the TMDL process.

Finally, even if these provisions are not themselves considered water quality standards, they must at a minimum be considered "policies generally affecting [the] application and implementation" of water quality standards, which are "subject to EPA review and approval" under 40 C.F.R. §131.13. *See* NWEA Br. at 13, n.5. EPA fails to even address this argument.

**B.      EPA Has the Authority to Review Oregon's Nonpoint Source Exemptions**

EPA argues that even if Oregon's nonpoint source provisions are water quality standards, because EPA lacks the authority to directly regulate nonpoint sources, it necessarily lacks the authority to take action on state water quality standards pertaining to nonpoint sources. EPA's argument fails, however, because one conclusion does not follow from the other.

As discussed extensively in NWEA's opening brief, EPA's argument here simply cannot be squared with *Pronsolino v. Nastri*, 291 F.3d 1123 (9th Cir. 2002). There EPA defended its authority to directly establish a TMDL, in the absence of state action, which addressed only nonpoint sources. Rather than directly discussing *Pronsolino*, EPA continues to rely on *American Wildlands v. Browner*, 260 F.3d 1192 (10th Cir. 2001), a case that *conflicts* with the Ninth Circuit's binding conclusion in *Pronsolino*.

To the extent EPA does attempt to distinguish *Pronsolino*, its proffered distinctions are hollow. EPA claims that even though it developed the nonpoint source TMDL for California, it left it up to California to develop and carry out the implementation plan for the TMDL at issue in *Pronsolino*. EPA Br. at 16. But EPA fails to explain how that action is distinguishable from this context. Here, if EPA reviewed and acted on Oregon's nonpoint source provisions, EPA would

not be getting into the business of *implementing* the revised standards for the state any more than EPA was *implementing* the TMDL it developed for California – because both TMDLs and standards are ultimately about the goals for a waterbody.[6]

In this vein, EPA argues that had it reviewed and disapproved Oregon's nonpoint source exemptions, it would have been required to promulgate replacements to the exemptions, amounting to the "direct regulation of nonpoint source[s]." *Id*. at n.8. Aside from conflating water quality standards with "direct regulation," EPA is incorrect that it would be required to promulgate anything in their stead. EPA routinely rejects state water quality standards exemptions without promulgating replacements *precisely because* they are exemptions. As EPA explained in its disapproval of a "variance" provision in Vermont's standards: "Because an exemption provision is not necessary to meet the requirements of the CWA, it is not necessary for EPA to promulgate an alternative provision in response to this disapproval." *See* http://www.nrb.state.vt.us/wrp/rulemaking/vwqs/filedruledocs/epaletter.pdf (last visited Feb. 25, 2011).[7] Thus, EPA could simply disapprove Oregon's nonpoint source provisions.

For all of the foregoing reasons, EPA's refusal to act on Oregon's nonpoint source provisions violates EPA's mandatory duty under the CWA. NWEA is entitled to summary

---

[6] Another very recent EPA action undermines the position EPA advances here. EPA withdrew its approval of Vermont's TMDL for Lake Champlain because Vermont did not adequately address nonpoint sources in the TMDL. *See Reconsideration of EPA's Approval of Vermont's 2002 Lake Champlain Phosphorus Total Maximum Daily Load ("TMDL") and Determination to Disapprove the TMDL*, January 24, 2011, *available at* http://www.epa.gov/region1/eco/tmdl/ pdfs/vt/Lake ChamplainTMDLDisapprovalDecision.pdf (last visited Feb. 25, 2011). Notably, EPA based its decision in part on inadequacies in how the TMDL *implementation plan* addressed nonpoint sources. *Id*. at 11. And EPA informed Vermont that EPA would be developing a TMDL for the state. *Id*. at 16. Thus, EPA simply cannot and does not leave all of the details to the states when it comes to nonpoint source control in the context of required CWA actions.

[7] Indeed, EPA did the same thing when it disapproved Oregon's alternative mixing zone rule, which was at issue in the earlier litigation. *See* http://www.deq.state.or.us/about/eqc/agendas/ attachments/2007feb/G-TempMixingZoneRule Revision.pdf (last visited February 25, 2011) ("EPA will not adopt an alternate mixing zone rule for the State.").

judgment on Claim 1 (or in the alternative, Claim 2).[8]

## II.    EPA's Approval of the Natural Conditions Criterion Was Unlawful

Much like the nonpoint source provisions discussed above, Oregon's Natural Conditions

Criterion ("NCC") serves as a gaping exemption to the numeric criteria.  The NCC allows

Oregon to replace numeric criteria with higher temperatures when it decides a water historically

exceeded those criteria.  OAR 340-041-0028(8).  Although styled as "natural," the NCC works

only to increase temperatures above numeric standards; it does not recreate naturally cooler

conditions.  *Id.*  And because Oregon is likely to use the NCC throughout the state, it will

effectively swallow the numeric criteria.[9]  EPA 592 at 023004.  In approving the NCC, EPA

relied on improper assumptions, ignored significant technical shortcomings, and circumvented

CWA requirements.  Thus, EPA's approval of the NCC was arbitrary and capricious.

### A.    EPA's Approval Rests on Faulty Logic and Misplaced Assumptions

EPA erroneously assumed that because historically "*portions* of rivers and

streams…naturally exceed[ed] the numeric criteria," and because those conditions "clearly

supported healthy salmonid populations," the NCC would, necessarily, also protect salmon.

---

[8]  Oregon incorrectly asserts that the remedy NWEA seeks on this claim is for the Court to "have
the temperature standards themselves disapproved."  Or. Br. at 5.  Rather, NWEA seeks an order
compelling EPA to review and approve or disapprove the specific provisions EPA has declined
to review to date, OAR 340-041-0028(12)(e) – (h), OAR 340-041-0061(11) and (13), and OAR
340-041-0004(4)(a) and (b).  While NWEA believes the CWA will demand EPA disapprove
these provisions, EPA should first conduct the review and make a record of its decision.

[9]  In fact, in *every* temperature TMDL Oregon has issued since EPA approved these water quality
standards, Oregon has applied the NCC to all waters in each basin covered.  *See*
http://www.deq.state.or.us/WQ/TMDLs/basinlist.htm; *see, e.g.*, John Day Basin TMDL,
approved by EPA December 17, 2010, http://www.deq.state.or.us/WQ/
TMDLs/docs/johndaybasin/TMDLandWQMPFINAL.pdf (Figures 2.1-3 - 2.1-5 on pages 62-63
with graphs of "Natural Thermal Potential" for the three modeled rivers in the basin).  And,
because Oregon has "identified only one watershed (the Hood) in the State that may reach" the
revised numeric criteria, EPA 801 at 024949, Oregon will be preparing TMDLs on virtually
every river in the state.  Thus one cannot overstate the reach of the NCC provision.

EPA 1[10] at 000061 (emphasis added).  This conclusion is illogical because by its terms the NCC does not recreate *both* naturally warm and cool conditions; it is a one-way ratchet that works only to allow waters to exceed the numeric criteria.[11]  At best, the NCC recreates only the hottest parts of "natural" conditions.  As a result, that *some* water was naturally warm is irrelevant to whether the NCC protects uses.  Truly natural conditions supported salmonids because they provided significantly colder conditions along with areas of warmer water.  EPA 1226 at 037146 (noting that "although . . . historical water temperatures exceeded optimal conditions for salmonids at times during summer on some rivers, the temperature diversity in these unaltered rivers provided enough cold water during the summer to allow salmonid populations as a whole to thrive").  For EPA to rely on past conditions to justify its approval, the NCC would have to work to reestablish *both* natural lows as well as natural highs.  Because the NCC provides for only temperatures higher than numeric criteria, EPA's approval is based on a logical fallacy.

Had EPA performed a proper inquiry, it would have discovered that much of what allowed salmonids to survive suboptimal waters has been lost or destroyed.  Salmon thrived in historically warm waters by accessing the associated complex habitat of cooler water and refugia.  EPA 106 at 013696-708.  The record shows this historic complexity has been widely

---

[10] For consistency with EPA's brief, NWEA will cite EPA's Technical Support Document (TSD) as "EPA 1," though it is actually "Att. 1" to EPA 1, as NWEA noted in its opening brief.

[11] The record contains one complete Oregon TMDL which illustrates that were the mainstem Grande Ronde River to meet its simulated "site potential"—an estimate of what temperatures would be like if reversible human impacts were removed—50% of the river would naturally be cooler than the otherwise applicable numeric criteria, 18 and 16°C (64 and 60.8°F), while approximately the other 50% of the river would exceed the numeric criteria.  EPA 114 at 014035; *see also* EPA 104 at 013537.  Thus, because it only allows temperatures to rise above the numeric criteria, but does not also force them to fall below the criteria, were the NCC to apply on the Grande Ronde, 50% of the river would be allowed to *exceed* the numeric criteria, while the rest of the river would be allowed to rise to the applicable numeric criteria.  In other words, the resulting temperature under the NCC would look like a plateau at the numeric criteria, punctuated by peaks of hot water.

lost.  For example, the Willamette has lost 75% of the shoreline from its "once highly braided [system] with numerous side channels offering ideal rearing habitat[.]"  EPA 138 at 015789; *see also* FWS 250 at 06263.  EPA failed to consider whether, without the extensive naturally cooler side channels, historically high temperatures in the Willamette mainstem would protect salmonids.  And, arbitrarily, while EPA concluded the 20°C criterion required mitigating cold water refugia, without explanation it approved Oregon's NCC, which allows temperatures well above 20°C with no requirement for refugia whatsoever.[12]

**B.    Without Reliable and Accurate Estimates of "Natural" Temperatures EPA's Approval is Unsupportable**

Even without these glaring errors, EPA's approval of the NCC is arbitrary and capricious because Oregon cannot reliably determine what is "natural."  NWEA recognizes Oregon's rules call for "the best available methods of analysis" to estimate natural thermal potential, and that the Temperature Guidance suggests five such methods.  EPA Br. at 30.  But the record also demonstrates *all* of these methods are unreliable and produce significant errors in their estimates of "natural."[13]  EPA complains NWEA focused only on models in its opening brief, but NWEA

---

[12] Moreover, contrary to EPA's suggestion (EPA Br. at 31), NWEA does not argue EPA must "compensate for degradation caused by other stressors."  Rather, EPA must evaluate whether the NCC will protect salmonids in light of these other stressors.  40 C.F.R. § 131.11(a)(1).  EPA cannot merely *assume* historic temperatures above numeric criteria will protect salmonids today.  For example, were EPA to conduct a proper inquiry, it may discover that because a river's side channels and deep pools have been lost, thus removing key cold habitat, salmon can no longer survive lethal temperatures in the mainstem of the river.  EPA's failure to consider current environmental conditions is tantamount to assuming that because an otherwise healthy child survived a fever of 105°F, she could do so again when she is elderly and sick.

[13] *See e.g.* EPA 592 at 023004-05 (noting that reference streams "may be of limited utility in describing potential or current stream thermodynamics"); EPA 592 at 023005 (showing that data on "biological distributions of salmonids . . . to estimate thermal conditions that existed prior to Euro-american settlement . . . is fraught with uncertainty"); EPA 104 at 013567 (explaining historic temperature data "often do not adequately capture the spatial and/or temporal variability in stream temperature" and raise issues of data quality and human contributions); EPA 104 at

did so because, as Oregon's own technical committee found, "modeling is ultimately *the only realistic* means of estimating the natural thermal regime of most streams and rivers." FWS 63, Att. C2 at 00881 (emphasis added); *see also* EPA 5 at 000151-52 (showing Oregon analyzes natural conditions in TMDLs using "a process model known as 'Heat Source.'"). If, however, EPA is correct that Oregon does "not rely on the use of such models" (EPA Br. at 30), its estimates of "natural" are likely even less reliable. Regardless of what method Oregon uses, the record leaves no doubt that even modeling, the most reliable estimation method, produces significant errors. NWEA Br. at 28; EPA 630 at 023255–57; EPA 592 at 023004 (Oregon believed models cannot "credibly predict natural thermal conditions"). Because EPA knew that the techniques available to estimate the natural potential temperatures under the NCC are seriously flawed, its approval was arbitrary and capricious.[14] *Native Ecosystems Council v.*

---

013566 (highlighting the limited applicability of the "Demonstrating" method as most appropriate for pristine watersheds).

[14]Additionally, despite the text of Oregon's rule, which ostensibly prohibits Oregon from including anthropogenic influences, EPA knew Oregon would include human influences in its estimates of "natural" temperatures. First, as noted above, Oregon intended to implement the NCC via TMDLs, EPA 5 at 000152, which, EPA knew would apply to "whole [river] basin[s]". EPA 765 Att. 2 at 024655; EPA 114 at 014006 (noting the TMDL applies to all "[p]erennial streams" in the basin). Yet, EPA also knew that in its TMDLs Oregon does not estimate natural conditions of any part of the basin other than large mainstem rivers. EPA 592 at 023006; EPA 114 at 014034 (showing the only waters in a subbasin for which Oregon estimated natural conditions were 95 miles of the mainstem). In other words, EPA knew that Oregon would apply the NCC to *tributaries* without modeling their natural temperatures, free from human impacts. Likewise, as Oregon does not attempt to model tributaries' natural conditions, even where Oregon actually does attempt to model some natural conditions on *mainstems*, it necessarily includes potentially significant anthropogenic influences from the unmodeled tributaries. *See, e.g.* EPA 114 at 014034 (Upper Grande Ronde TMDL); *see also* EPA 592 at 023005 (expressing concerns about what to do with non-modeled streams). EPA was equally aware other sources of natural cooling are omitted from Oregon estimates of natural; whenever Oregon omits sources of cooling from its models, it necessarily increases the estimated past temperatures. For example, groundwater once provided significant amounts of very cold water to rivers in Oregon. Despite the importance of this natural cooling phenomenon, Oregon's models assume no cold water inflow from groundwater, unless the agency has data. EPA 114 at 014033; EPA 136 at 015478. In light of this, it is understandable why Oregon itself insisted it could not "credibly predict

*Tidwell*, 599 F.3d 926, 935, 938 (2010).

> **C.      EPA's Approval Violates the CWA Review Requirements**

Finally, EPA's approval of the NCC violates CWA requirements related to narrative criteria and EPA obligations to review water quality standards.  First, EPA rules limit the use of narrative criteria to two contexts: (1) "where numerical criteria cannot be established," and (2) as a "supplement [to] numerical criteria."  40 C.F.R. § 131.11(b)(2).  Here, obviously, numerical criteria *can* be established, as Oregon has done just that.  *See* OAR 304-041-0028(4); *see also, infra* 12-13.  And, contrary to EPA's argument, the NCC is not a "supplement" to numeric criteria (EPA Br. at 32), because once Oregon determines a river is "naturally" warmer than the applicable numeric criteria, the NCC allows Oregon to effectively delete the approved criterion and fully replace it with warmer criteria.  The NCC does not supplement, but *supplants*, the numeric criteria.

Because the NCC effectively supplants existing criteria, it permits Oregon to adopt new criteria, and thus change the level of protection of its water quality standards, without going through mandatory EPA review and approval.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 131.11(a).  The NCC violates this requirement by allowing Oregon to change its criteria without identifying the changes in state water quality standards rules and without submitting them to EPA for review and approval.  Thus, the NCC is illegal under the CWA.  *Id*.; *see also Ohio Valley Environmental Coalition v. Horinko*, 279 F.Supp.2d 732, 764 (S.D.W.Va. 2003) ("*OVEC*").

As discussed in NWEA's opening brief (NWEA Br. at 31), EPA's failure here is nearly

---

natural thermal conditions circa 1850."  EPA 592 at 023004.  Thus, contrary to EPA's arguments (EPA Br. at 30), the record demonstrates EPA knew Oregon necessarily would include human impacts in its estimates of natural conditions.

identical to that in *OVEC*.  279 F.Supp.2d at 764.  There, EPA approved a state water quality standard provision that allowed the state to change its antidegradation policy in the future without EPA approval.  *Id*.  EPA attempts to distinguish *OVEC* by arguing that "Oregon's narrative provision regarding natural thermal potential already has been approved."  EPA Br. at 32.  But, in *OVEC*, EPA had also approved the provision, and the court found that EPA's pre-approval of future revisions without review was illegal.  Just as in *OVEC*, EPA has violated the CWA by approving Oregon's criterion that allows Oregon to remove and replace water quality criteria without going through CWA § 303(c) review.

EPA's additional argument that it "remain[s] involved in the implementation of the natural conditions provision" via TMDLs and other processes is meritless.  EPA Br. at 32 n.28.  First, staying "involved" is not the applicable legal standard.  40 C.F.R. § 131.11(a)(1).  Second, EPA's review of TMDLs is different than its review of water quality standards, where EPA must use "sound scien[ce]" to determine if proposed criteria will protect uses.  *Id*.; 33 U.S.C. § 1313(c).  EPA's review of TMDLs and 303(d) lists are conducted pursuant to different regulations, which, *inter alia*, make no reference to EPA's reviewing state criteria to ensure they protect designated uses.  40 C.F.R. § 130.7.  Yet, having approved, without any conditions whatsoever, all the NCC's *future* changes to criteria, EPA has released itself from evaluating whether the superseding warmer criteria will ensure protection of uses.

Finally, EPA's approval of the NCC also fails to conform with its own policy on how natural background conditions may be used as water quality criteria.  EPA's policy calls for states to use site-specific criteria where they wish to alter criteria to reflect natural conditions.  Memorandum from Tudor T. Davies, Director of the Office of Science and Technology (Nov. 5, 1997), http://www.epa.gov/waterscience/criteria/library/naturalback.pdf (last visited Feb. 25,

2011) (hereinafter Davies Memo) at 1-2;[15] *see also* EPA 517 at 022370 (noting one "pro" of requiring site-specific numeric criteria is it "[m]eets EPA's policy"); EPA 87 at 002721; EPA 1221 at 036764; *Northwest Environmental Advocates v. EPA*, 268 F.Supp.2d 1255, 1269 (D.Or. 2003) ("*NWEA I*") ("As is the case whenever a state revises its water quality standards, EPA must review and approve any site-specific criterion before it takes effect.").  Avoiding this long-standing policy and the CWA, EPA adopted an extra-legal approach to pre-approve future widespread revisions to Oregon's temperature standards.  The CWA does not provide for such pre-approval of water quality standards.  NWEA is entitled to summary judgment on Claim 8.[16]

## III.   EPA Arbitrarily and Capriciously Approved Oregon's Numeric Criteria

Not only has Oregon exempted the largest sources of temperature increases and created a tool to allow waters to exceed numeric criteria, the numeric criteria themselves wholly fail to ensure they "support the most sensitive use[s]" in Oregon's waters.  40 C.F.R. § 131.11(a).  As a result, NWEA is entitled to summary judgment on Claims 4 through 7.

---

[15]  To set site-specific criteria, a state must assess the "natural background" of a waterbody using a "procedure for determining natural background specific enough to establish natural background [conditions] accurately and reproducibly."  Davies Memo at 2.  Having provided notice and comment on the "procedure and the site specific numeric criteria derived from the procedure" and "documented" and "specif[ied] the water body segments to which the site specific criteria apply," the state may adopt the results as site-specific criteria.  *Id*.  Finally, "EPA will approve site specific criteria developed on the basis of sound scientific rationales."  *Id*. at 1.  Oregon's rule contains no procedure, requires no identification of the numeric criteria derived from a procedure, and no specification as to the water body segments to which the criteria apply.

[16]  Similarly, EPA's approval of the Human Use Allowance ("HUA") was arbitrary because it lacks scientifically sound evidence that allowing 0.3°C increases will *always* protect the designated uses.  NWEA Br. at 31-32.  The agency cannot rationally conclude that temperature increases of 0.3°C will be insignificant in all sensitive areas (*e.g.*, critical refugia), or in waterbodies where the temperature is as of yet unknown (*e.g.*, natural conditions criteria).  For example, discharges of an extra 0.3°C of heat into refugia, which is defined as only 2°C lower than surrounding water, cannot be insignificant.  Additionally, EPA's response to NWEA's cumulative effects argument, that the agency is not "aware" of a situation where multiple point sources are discharging in the same location, is irrelevant.  EPA Br. at 33.  The fact that the HUA *allows* cumulative increases of more than 0.3°C is what matters.

A.    **EPA's Arguments Are Based on an Improperly Deferential Standard of Review, Lack Support in the Record, and Misconstrue NWEA's Burden**

As an initial matter, EPA incorrectly suggests this Court should accept EPA's views about Oregon's numeric criteria because the underlying issues in this case involve "science." Although the APA's standard of review is deferential toward an agency's decision within its special area of expertise, "nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a *rational connection* between the facts found and the choice made." *Nw. Coal. for Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1048 (9th Cir. 2008) ("*NCAP*") (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983)) (emphasis added). Importantly, the reviewing court must distinguish between the *scope* of review, which is narrowed by an agency's science, and the *depth* of review, which must be sufficient for the court to "comprehend the agency's handling of the evidence cited or relied upon." *Id*. at 1052 n.7 (internal quotation omitted). Even though "data interpretation and analysis are functions that often lie within an agency's realm of expertise, it is [a court's] duty to review those functions to ascertain whether the agency's actions were complete, reasoned, and adequately explained." *Id*. Thus, rather than simply defer to EPA's "scientific" determinations, EPA Br. at 11, 19, 23, 27, this Court must conduct a probing review of EPA's decisions and the administrative record evidence in this case.

Second, EPA's repeated references to the "scientific" soundness of its decision-making are often mere references to the agency's prior conclusions. EPA litters its brief with statements that its conclusions are based on "science," but EPA often cites only its own TSD or the Temperature Guidance. *See e.g.,* EPA Br. at 10, 18, 21, 35, 40. The TSD, of course, is simply EPA's decision document in this case, not record evidence. Citing the TSD to demonstrate a particular decision was based on sound science is the equivalent to EPA arguing "it's true

because we said so." Likewise, EPA's repeated reliance on the Temperature Guidance is inapposite because this Court already concluded the Temperature Guidance "is the agency decision for all practical purposes." *NWEA v. EPA*, No. 05-1876-HA, 2008 WL 111054, at *3 (D. Or. Jan. 7, 2008). Because the Court ordered EPA to include in the record the documents underlying the development of the Temperature Guidance, *id.*, the agency must now demonstrate that those documents support its conclusions. Showing that Oregon's standards may be consistent with the Guidance is no substitute for EPA's obligation to base its decisions on facts in the record.[17]

Moreover, EPA's frequent arguments without citations to record evidence amount to "we are correct because this is common sense." However, an agency's "common-sense argument lacks legal significance in the APA review context where… the agency failed to articulate the grounds for its purportedly common-sense decision anywhere in the administrative record." *Arrington v. Daniels*, 516 F.3d 1106, 1114 n.5 (9th Cir. 2008). For example, EPA makes a *spatial* "common sense" assumption that rivers are always colder upstream, and thus fish will experience warmest temperatures only at a river's lowest reach. *See* EPA Br. at 25 n.18, 27 n.21,

---

[17] Additionally, NWEA seeks to respond to EPA's accusation that NWEA mischaracterized background facts surrounding the development of the Temperature Guidance. EPA 9 at n.1. Both EPA's general accusation and its specific "correction" are inaccurate. EPA asserts NWEA did not understand that the "primary focus" of the first version of the Temperature Guidance was the establishment of "thermal potential" criteria. *Id.* In fact, this version proposed a two-step process: 1) Appendix A outlined the "interim" numeric criteria, and 2) Appendix B outlined the development of superseding "thermal potential numeric criteria." EPA 571 at 022854, 64, 70. This approach is *no different* from Oregon's two-step process approved by EPA. Oregon's numeric criteria serve as "interim" criteria until a TMDL is completed; upon completion of a TMDL, the NCC provision supersedes the numeric criteria with "natural thermal potential." NWEA's point was that the real difference between the first and the final version of the Guidance was the protection level of the numeric criteria, the technical rigor for natural conditions findings, and a requirement that the resulting natural conditions would be "numeric criteria."

48.  However, the record demonstrates that upstream waters are not necessarily cooler.  *See e.g.* EPA 114 at 014081, 014090.  Similarly, EPA makes a *temporal* "common sense" assumption that rivers cool seasonally, and thus waters will be protectively cool when the relevant designated uses occur.  *See* EPA. Br. at 19.  However, the record demonstrates many salmonids are present in large and medium-sized rivers during peak summer temperatures.  *See e.g.* EPA 972 at 027039-40; *see also infra* at 19-20, 26-28.  This illustrates well the admonition in *Arrington* against allowing agencies to rely merely on common sense; here, the record demonstrates that EPA's "common sense" assumptions are false.

Finally, EPA seeks to shield its decisions from a probing review by imposing an inappropriate burden of proof on NWEA.  To be sure, the party raising a claim under the APA bears the burden to prove the agency's action was arbitrary and capricious.  *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).  This burden, however, does not require NWEA to prove the opposite of EPA's conclusions.  *Arizona Cattle Growers' Ass'n. v. U.S. Fish & Wildlife Serv.*, 63 F.Supp.2d 1034, 1044 (D. Ariz. 1998).  Shifting the burden to plaintiff in this fashion is improper because the "APA makes clear that it is the agency's responsibility to consider evidence in the record and proceed on a rational and reasoned basis."  *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1181 (9th Cir. 2004) (McKeown, J., dissenting) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).  Removing the burden from the agencies would "eviscerate[] the APA's function of ensuring that agency actions are based on rational and reasoned decision-making."  *Id.*

As with the defendant in *Arizona Cattle*, EPA improperly defends its assumption of temporal cooling by claiming NWEA has not proven water temperatures would *not* cool below established temperature criteria when the corresponding use occurs.  *See* EPA Br. at 18, 26, 29

n.24.  EPA misconstrues NWEA's burden.  NWEA need only show, and has shown, that EPA's approval of inadequate temperatures is unsupported by the record and is, therefore, arbitrary.

    **B.**    **EPA's Approval of 20°C Criterion Was Arbitrary and Capricious**

EPA approved Oregon's criterion for salmonid migration, allowing rivers to reach 20°C, a temperature EPA has already rejected as unprotective.  *See NWEA I*, 268 F.Supp.2d at 1259. EPA approved 20°C this time because Oregon added a "coldwater refugia" narrative criterion in an attempt to salvage the standard.  Because Oregon's refugia criterion is fatally flawed, however, EPA's approval of the 20°C criterion was arbitrary and capricious.

First, EPA cannot properly rely on the refugia provision because EPA does not know where, when, or if cold water refugia exist or can be created.  EPA 1 at 000056.  Therefore, when it approved the 20°C criterion, EPA was left to guess whether the refugia component could mitigate its demonstrated harms.  While NWEA agrees water quality criteria should be aspirational, they cannot be so speculative that EPA cannot determine, based on evidence, that they will fully protect the uses.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.11(a).

Nor can EPA, contrary to its suggestion (EPA 1 at 000056-57, EPA Br. at 19), fulfill its obligation to base its approval on "sound science" by waiting for Oregon to search for refugia as part of the TMDL process or through NPDES permit issuance.  40 C.F.R. §§ 131.11(a), 131.6(f). As an initial matter, nothing in the record indicates *how* Oregon will implement the refugia provision through TMDLs or that Oregon even has the regulatory authority to require NPDES permittees to create or protect refugia.  Moreover, EPA must review the scientific soundness of the criteria *at the time of approval*; it cannot base its approval today on what it hopes a state may discover in the future.  40 C.F.R. § 131.11(a).  Further, as discussed above with respect to the Natural Conditions Criterion, *supra* at 12, EPA reviews TMDLs and criteria for very different

standards.[18]  *Compare* 40 C.F.R. § 131.11(a) *with* 40 C.F.R. § 130.7.  And EPA may, but is not required to review NPDES permits at all.  As a result, without knowing when, where, or if refugia exist, EPA's approval of this criterion is arbitrary.

Second, EPA argues it need not and cannot define what constitutes "sufficient" refugia.  EPA Br. at 19-20.  NWEA has not asked that EPA turn a narrative criterion into a numeric one, but rather that EPA require Oregon to define "sufficient" to demonstrate the provision protects the use, and is a scientifically sound and realistic offset to the harm from the 20°C criterion.[19]  40 C.F.R. § 131.11(a).  Without a specific, measurable definition of "sufficient," Oregon has no regulatory method to discern whether the criterion is met or to protect critical refugia.

Finally, EPA's approval of Oregon's decision to count nighttime low temperatures as "refugia" defies logic.  EPA Br. at 20.  EPA explained the purpose of refugia is to allow fish "to avoid maximum temperatures."  EPA Br. at 17; EPA 1 at 000056.  By allowing Oregon to count colder nighttime temperatures as refugia for daytime highs, EPA failed to meet its stated purpose of refugia.  NWEA agrees rivers should provide "spatial refugia, diurnal refugia and seasonal refugia," (EPA Br. at 20), but the record is replete with evidence of the unique role *spatial* refugia play.  *See, e.g.*, EPA 121 at 014585-87; EPA 117 at 014376-67 (stressing that cooler segments and patches allow salmonids to avoid predation and obtain temperatures for growth); EPA 143 at 017273; EPA 119 at 014537, 014540 (explaining loss of spatial refugia "preclude

---

[18] Although EPA apparently avoids routine ESA consultation on TMDLs in Oregon, the record shows that when it did engage in ESA review, EPA precluded NMFS from reviewing the effects of the criteria *at the very stage* when narrative criteria are interpreted and applied, the TMDL.  EPA 582 at 022946 ("EPA made it clear that it [and thus NMFS] had no authority in a TMDL review to consider effects of the standard.").

[19] EPA has, itself, shown it *can* determine "sufficient" refugia levels, even if those definitions are obviously inadequate to protect fish.  *See e.g.,* EPA 75 at 002479 ("[T]he amount of cold water refugia would be sufficient to protect this use if a typical migrating salmon or steelhead could access waters that are 18°C, or colder for at least 12 hours a day."); EPA 395 at 020992.

salmonids' ability to escape high temperatures").  If Oregon is not required to ensure refugia exist for salmonids at the same times and places as maximum temperatures, the provision fails to achieve its purpose.  Thus, EPA's reliance on the refugia provision is arbitrary.

Without the refugia, EPA's approval of the 20°C criterion is simply unsupportable.[20] NWEA documented the undisputed species-threatening effects of a 20°C criterion.  NWEA Br. at 16-17.  *See also,* EPA 75 at 002479 ("criterion of 20°C alone [is] unprotective of the designated use").  Temperatures in this range are in the "high" disease risk category, "commonly associated with very severe infections and often catastrophic outbreaks of many fish diseases." EPA 107 at 013830; EPA 104 at 013543.  Contrary to EPA's allegation (EPA Br. at 19), NWEA does not dispute there is "seasonal cooling."  NWEA's point is that the record shows many salmonids are present during the hottest times of the year, and thus receive no protection from cooling trends in a different season.  EPA 58 at 001799, EPA 104 at 013555.  EPA cannot ignore the legal requirement to protect these vital "tails" of species' populations.  EPA 736 at 024489.[21]

One vitally important use NMFS identified as being present during these summer temperatures in 20°C criterion waters are "holding" adults.[22]  Adult salmonids will "hold" while waiting for genetic and environmental triggers to tell them to ascend the tributaries and spawn. EPA 107 at 013807.  The record demonstrates holding adults are particularly vulnerable, and

---

[20] EPA claims that NWEA's criticism of the 20°C criterion alone, without the additional refugia requirement, is inapposite.  EPA Br. at 17, n.10.  At the same time, EPA attempts to downplay the well-documented adverse effects of the 20°C criterion.  EPA Br. at 17-18.  Any attempt by EPA to distance itself from the admittedly unprotective 20°C criterion should be rejected; if the refugia provision fails (which it does), EPA's approval of the 20°C criterion must be set aside.

[21] NMFS cautioned EPA on the importance of "early and late 'tails' of juvenile fish outmigration" because "[i]n order to protect and restore the genetic diversity of anadromous fish populations and recover listed species, it is vitally important that remnant portions of runs that are able to migrate earlier or later than the bulk of the population are protected and restored." EPA 736 at 24489.

[22] NMFS identified two species of chinook and three species of steelhead present as holding adults in 20°C criterion waters.  EPA 58 at 001800.

suffer "pronounced" mortality at temperatures as low as 15.6°C;[23] thus they need particularly cold water to survive until spawning.  *Id*; EPA 136 at 015585, 01549; *see also* EPA 123 at 014642; EPA 124 at 014739, 014744-45 (noting survival of holding adults "declines dramatically" over 17°C).  Additionally, the temperatures salmon experience while holding are critical in determining the viability of the eggs the pre-spawning adult carry; indeed, holding temperatures are as key to egg viability as incubation temperatures.  EPA 136 at 015549.  Adults holding at 13-15.6°C, well under the 20°C criterion, suffer "detrimental effect[s] on the size, number, and/or fertility of eggs held in vivo."  EPA 124 at 014680; *id*. at 014739-014744.  Thus, EPA recommended 13°C to protect against "Reduced Viability of Gametes in Holding Adults" EPA 104 at 103543, and assigned holding adults to the "Core" (16°C) use.  *Id*. at 013552 (tbl. 3).  But, Oregon did not include this use in the 16°C criterion.[24]  Because criteria must "support the most sensitive use," including holding adults, and the 20°C criterion fails to do so, EPA's approval of this criterion is arbitrary.  40 C.F.R. § 131.11(a).

## C.    EPA's Approval of Oregon's 12ºC Criterion Was Arbitrary and Capricious

Despite the undisputed need for 9°C to support bull trout *spawning*, EPA approved a

---

[23] The numeric criteria are expressed in a "7DADM" metric, which shows the daily maximum temperatures averaged across seven days.  *See* EPA 104 at 013546-47.  Because most studies on salmonids use "constant" temperatures, rather than the 7DADM metric, the criteria must be translated into "constant equivalents."  Generally, the 7DADM is higher than the constant equivalent because water temperatures fluctuate diurnally, to some degree, making daily maximums above daily averages.  This relationship between 7DADM and constant temperatures, however, depends entirely on the diurnal flux of a waterbody.  All other things being equal, a 7DADM for a water body with a large diurnal flux translates into a lower constant equivalent, while the 7DADM for a water body with a small diurnal flux results in a higher constant equivalent.  In this brief, temperatures related to studies are expressed as constant temperatures and temperatures related to the criteria themselves are 7DADM, unless otherwise noted.

[24]  Despite the importance of this life stage, Oregon did not specify adult holding as a specific use.  Therefore, holding adults are covered by the other uses that cover adults, the Migration Corridor (20°C) and the Rearing and Migration (18°C) designations.  And, in fact, holding adults are present in those waters.

single 12°C criterion for all bull trout life stages including spawning.  In its brief, EPA ignored

NWEA's substantive arguments and its own scientific data, and instead mischaracterized

NWEA's argument.[25]  EPA has failed to meet its burden to demonstrate the 12°C criterion will

protect sensitive life stages of bull trout.

> **1.    The Record Does Not Demonstrate that 12°C Protects All Bull Trout
> Life Stages**

EPA's approval of Oregon's 12°C criterion is deeply flawed because it relies on two

wholly unsupported assumptions.  EPA Br. at 22.  First, EPA concluded the 12°C criterion is

protective because it assumed temperatures will "naturally decrease" from a summer maximum

of 12°C to under 9°C in time to protect bull trout spawning and egg incubation.  *Id*.  NWEA does

not dispute that, in general, seasonal cooling "is well-established" (EPA Br. at 23), but EPA has

failed to support its assumption that temperatures will fall by at least 3°C by August 15 or

September 1.[26]  *See* NWEA Br. at 21-22.  Instead, data in the record show that waters, generally,

do not experience 3°C decreases until mid- to late-September, well after bull trout need to begin

spawning.  *See* EPA 105 at 013590 tbl.2.  In Oregon's John Day study, for example, not a single

stream reached 9°C in time for bull trout spawning and only two of the 15 streams had cooled by

---

[25]  For example, EPA characterized NWEA's argument—that its approval of Oregon's single, inadequate criterion was arbitrary—as a demand that EPA force Oregon to establish several criteria.  *See* EPA's Br. at 22–23.  This characterization is erroneous.  NWEA argues only that EPA must approve a criterion that protects "the most sensitive" designated use, however it accomplishes the task.  EPA is correct that "nothing in [its] regulations requires States to adopt more than one criterion," EPA Br. at 23, but its regulations are equally clear that EPA cannot approve a criterion that will not protect designated uses when they occur.  40 C.F.R. § 131.11(a).  The mandate to protect the most sensitive and existing uses is paramount; whether a state develops a single criterion or uses several.  EPA has failed to do so here.

[26]  EPA is correct that bull trout do spawn in September and October (EPA Br. at 23 n.16), but the same FWS document on which EPA relies states bull trout also spawn in July and August.  EPA 56 at 001702.  As explained further below, EPA cannot ignore some bull trout in favor of others.

3°C by the start of September.[27]  EPA 105 at 013590, 013596.  In the absence of a demonstration

that streams consistently cool by at least 3°C by bull trout spawning dates, EPA's approval

rationale is unsupported.[28]  That there is no such support is not surprising given EPA's admission

in the Temperature Guidance that it "did not assess data in sufficient detail to determine the

extent to which these uses are protected vis-à-vis the summer maximum criterion."  EPA 104 at

013557–58.[29]  Relying on unsupported assumptions is arbitrary and violates the CWA.

        Second, while recognizing "there may be some areas where bull trout spawn in the

summer," EPA failed to ensure protection of these early spawners.  EPA 75 at 002472.  EPA is

obligated to protect "the most sensitive designated use" in approving criteria, which in this case

is summer spawning bull trout.  40 C.F.R. § 131.11(a)(1).  Rather than assure Oregon protected

this "most sensitive use," EPA simply concluded, without basis, that current temperatures where

bull trout spawn in summer would "likely" be colder than the 12°C criterion.  EPA 75 at 002472.

Rather than ensuring Oregon's bull trout criterion protects bull trout spawning, EPA

hypothesized these summer-spawning bull trout would be protected by the Protecting Cold

Water criterion.  EPA Br. at 22 n.14; EPA 75 at 002472.  This criterion, however, applies only to

waters identified as *currently* colder than the applicable numeric criterion.[30]  OAR 340-041-

---

[27]  Additionally the most significant cooling occurs where temperatures are initially higher (e.g.
water peaking at 19.2°C dropped 3.8°C by September 2), EPA 105 at 013596, whereas streams
closest to meeting the 12°C criterion, dropped very little (e.g. water peaking at 12.8°C dropped
only 0.8°C to 12.0°C by September 2).  *Id*. at 13590.

[28]  Of course, as NWEA explained in its opening brief (NWEA Br. at 21) merely hoping, rather
than mandating, that waters reach 9°C in time for spawning amounts to setting no criterion at all.

[29]  As EPA relied on the Temperature Guidance as its principal source of support for its approval,
this unsupported and erroneous assumption has tainted the entire approval process.  *See* EPA 1 at
000058 (implying support from Temperature Guidance for cooling assumption); EPA 75 at
002472 (relying on the same unsupported assumption).

[30]  The Protecting Cold Water criterion would not necessarily protect summer bull trout
spawning because being *below 12°C* is patently not the same as being *below the 9°C* needed to
protect spawning.  And, not only does this criterion do nothing to lower temperatures, but

0028(11).  Even EPA's brief notes that "none of those sites [in the John Day study], was within the summer maximum of 12C," thus, the Protecting Cold Water criterion will not apply to that river.  EPA Br. at 23.  By failing to ensure protection of the most sensitive use—spawning, and in particular summer spawning—EPA's action is arbitrary and inconsistent with its regulations.

### 2. The Record Indicates That EPA Based Its Approval on Improper Motivations

Finally, EPA ignored the biological needs of rearing bull trout in favor of feasibility concerns.[31]  EPA admits it considered "implementation" rather than purely scientific issues (EPA Br. at 25) in what EPA termed the "trade-off" it presented FWS between the breadth of potential bull trout use areas and the protectiveness of the criterion.  FWS 581 at 10906-07.  Framing the issue as "a management/policy type decision that goes beyond just the science[,]" EPA told FWS that an 11°C criterion would prevent EPA from "broadly designat[ing] bull trout use to get at the fragmentation issue."  Id. (to which FWS internally replied that "11[°C] is [] upper optimal . . . and temperature is *the most important habitat factor* for bull trout.")(emphasis added).  In reaction to this pressure, FWS stated that it was "incongruous for EPA to discuss feasibility of application" in support of 13°C when it had advocated for a 10°C bull trout criterion in the past. FWS 569 at 10878.  FWS further countered by noting "a lot of criteria . . . are difficult to implement given input sources, use demands, lack of regulatory authorities, etc – but it doesn't discredit our best professional judgment and science."  *Id.*  In the end, rather than approving a criterion protective of bull trout uses, EPA forced a "trade-off," which, however characterized,

---

Oregon has no regulatory mechanism to protect currently cold temperatures.  *See* NWEA Br. at 44-45.

[31]  EPA correctly notes that NWEA misattributed a FWS employee's statement of the political climate surrounding the selection of the 12°C criterion to EPA.  NWEA's misstatement was inadvertent, and does not change NWEA's argument because EPA still improperly considered feasibility.

was included in EPA's deliberation and approval.[32]

### D.    EPA's Approval of Oregon's 18ºC Criterion Was Arbitrary and Capricious

Finally, EPA ignored fundamental flaws and relied on unsupported assumptions when it approved Oregon's 18ºC criterion. Compounding these problems, the 18ºC criterion is the most extensively applied numeric criterion, covering more salmonid life stages than any other. *See e.g.*, EPA 6 Att.1 at 000278. EPA failed to demonstrate the 18ºC criterion was scientifically defensible, as required by the CWA.

While EPA may not always need to mandate "optimal" criteria,[33] it must always ensure criteria protect uses. 40 C.F.R. § 131.11(a). Here, the record demonstrates the 18ºC criterion is both sub-optimal and does not support the uses for which it was intended. The optimal range for juvenile growth, critical to salmonid survival and maturation, is 10-16ºC. *See* EPA 124 at 014704; EPA 136 at 015516-17 (showing significant relationship between early growth rates ultimate fish survival). Allowing temperatures above the optimum range has severe effects on juvenile growth, as "temperatures above the optimum zone can result in sharply declining growth rates" that "plummet rapidly to zero." EPA 124 at 014670. Impaired growth, in turn, renders salmonids significantly more susceptible to both disease and predation. EPA 121 at 014581-82;

---

[32]  Additionally, when EPA approved the 13°C criterion it relied on the same assumptions that sufficient natural cooling would save a criterion set *above* the undisputed level required to protect the use. As EPA's assumptions are equally flawed and unsupported here, its approval of the 13°C criterion, too, must be rejected. *See* NWEA Br. at 24. Rather than showing that the criterion protects the use, EPA simply restates the legally correct but irrelevant principle that the CWA does not "require a state [to] adopt more than one temperature criterion." EPA Br. at 26. The CWA also mandates that, regardless of how many criteria are needed, they *must* ensure the protection of the use. Here, the criterion EPA approved does not do so.

[33]  In the TSD and Temperature Guidance, EPA refers to the 18 ºC criterion as "near optimal" and asserts that it "minimize[s]" the risk of "elevated" disease levels and "prevents" risk of "high" disease. *See, e.g.,* EPA 104 at 013555. In contrast, NMFS refers to this criterion as "sub-optimal," says the disease risk is "elevated" and that it will "minimize" a "high risk of disease." EPA 58 att.1 at 001789. This "high" disease risk that NMFS says will merely be minimized has been described as "near obliteration," EPA 123 at 104640, and causing "extreme [] mortality." *Id*. at 104642.

EPA 123 at 014643, 014653.  And, as temperatures rise, diseases become more virulent and predators more numerous.  EPA 123 at 014644-46, *Id.* at 55; EPA 131 at 017287.  Temperature exacerbates infection and mortality rates from widespread diseases, such as *C. columnaris*,[34] which rapidly increases over 12.2ºC, and causes "significantly increased mortalities" over 15ºC. EPA 123 at 014641-42.  The record includes numerous examples of the mortality levels associated with EPA's "elevated" category of disease risk, which it associates with the 18ºC criterion, including 63-91% mortality in adult sockeye held at 15.6ºC, and 56% mortality in juvenile steelhead at 15ºC.  EPA 104 at 013543; EPA 123 at 014640-2, 44.  Despite clear harm to salmonids at temperatures allowed by the 18ºC criterion, EPA approved it.

Acknowledging the 18ºC criterion is too warm, EPA first rationalizes its approval because "portions of rivers and streams …were naturally (i.e. absent human impacts) warmer than…optimal[.]"  EPA 1 at 000055.  That salmon once thrived where *portions* of rivers were too warm is not a scientific basis for setting a suboptimal temperature as the *most-widely applied criterion in the state*.  The 18ºC criterion allows *entire* rivers, not just portions, to be suboptimal. Historically, salmon tolerated such sub-optimal temperatures because rivers also had complexity and coldwater refugia.  *See supra* 8-9.  Without also ensuring the existence of such mitigating conditions, EPA cannot rely on historic temperatures to find the 18ºC criterion is protective.[35]

EPA further justified its approval of the 18ºC criterion because salmonids "will use waters that are warmer than their optimal thermal range."  EPA 1 at 000055.  That fish may use suboptimal waters is no rationale to authorize applying such temperatures broadly.  EPA's own

---

[34]  EPA suggests salmonids' limited exposure eliminates disease risks (EPA Br. at 28), but the record is silent as to days of exposure associated with the 18ºC criterion.  However, even short exposures can be lethal; for example, the mean time until death for chinook infected with *A. liquifaciens* is a mere 1.3 days.  EPA 136 at 015582.
[35]  Nor can EPA rely on the cold water narrative, OAR 340-041-0028(11)(a), because there are so few *currently* cold waters to which it applies.  *See* EPA 104 at 13537.

Technical Synthesis cautioned that "[w]hile individual salmonids may be observed in streams where temperatures exceed laboratory-determined thermal tolerances, these observations alone are not grounds for concluding that warmer streams and rivers can support healthy salmonid populations."  EPA 119 at 014532; *see also* EPA 418 at 021228 ("frequently-cited anecdotal reports of fish in unusually 'hot' water in the field are not useful for setting temperature criteria").  Salmonids have little or no choice when caught between their genetic imperative to move through life cycle stages at certain times of year and in certain locations and the actual temperatures they encounter.  *See, e.g.*, EPA 131 at 014904 (discussing the genetically determined rearing and migration behavior).

EPA next justifies its approval with a series of assumptions for which there is no support in the record.  First, EPA assumes that because the criterion applies "throughout the water body, including [its] lowest downstream extent[,]" the waters upstream will necessarily be cooler. EPA 1 at 000055.  Again, the record contradicts EPA's assumption.  While rivers sometimes warm as they flow downstream, the record demonstrates rivers can be either highly variable or flat and may not, in fact, be uniformly cooler upstream.  EPA 114 at 014035 Fig.1 (showing modeled natural "site potential" temperatures with significant cooling and heating along 95 miles of the Grande Ronde and temperature actually *dropping* before its lowest downstream extent); EPA 286 at 020090 Fig. 13 (demonstrating estimated natural temperatures in the Kilchis and Wilson Rivers are near flat and *drop* towards mouth).  Not only do these data show EPA's assumption to be unsupported, but Oregon's rule contains nothing to *ensure* upstream locations are, in fact, cooler.

EPA's second assumption is that river temperatures will be meaningfully cooler than the annual maximum for the rest of the year.  EPA 1 at 000055.  By definition, a "maximum" can

occur only once, but as biologist Dale McCullough explained, assuming the maximum

"temperature is found only one time [a year], [and thus] the remainder of the time temperatures

are lower, we might be overlooking the actual temperature patterns."  EPA 513 at 022361.

Citing a study from Wall Creek, Dr. McCullough noted "the temperatures each day in August

(and maybe July) could be very close to the annual max."  *Id.*; *see also* EPA 694, Att.6 at

024015, 024028-30 (showing temperatures hovering near maximum for 6-8 weeks).  In other

words, river temperatures are likely to plateau at or near the annual maximum for a significant

portion of the summer, thus exposing fish to suboptimal temperatures for weeks or months.

Next, EPA assumes that for "*many*" rivers, meeting the 18°C criterion will translate into

a 15ºC weekly mean due to their diurnal flux.[36]  EPA 1 at 000055 (emphasis added).  While EPA

may be correct that *some* rivers meet this weekly mean, it has not demonstrated this occurs in the

"typical river."  *Id*.  Additionally, although EPA claims "data from ODEQ show that *many* rivers

that met the 18C criterion would *only* experience temperatures above 15C for *short durations*"

(EPA Br. at 28 (emphasis added)), the sole document on which EPA relies is a chart,

summarizing temperature data on *six* streams over the span of *one week* in 1999.  EPA 1 at

000055; EPA 753 at 024581-024584.  These six streams are not "many rivers," but rather, as

Oregon termed it, "a small bit of data."  EPA 753 at 024579.  EPA's assumption that unknown,

diurnal temperature flux protects salmonids in "many rivers" is wholly unsupported and not

scientifically defensible.[37]

Finally, even EPA admits that some rivers will not meet the assumed 15°C weekly mean,

---

[36]  As above, NWEA does not argue there is no diurnal flux in some rivers and streams.  Rather,
EPA has failed to show it can rely on such fluctuations to save these unprotective criteria.
[37]  In fact, Oregon's data on eight additional streams show that where the 7DADM temperature
was near the 18ºC criterion, between 17°C and 18.5°C, the weekly mean temperatures all
exceeded the 15°C.  EPA 753 at 024583-84.

because in rivers "with small diurnal temperature variation…fish are exposed to [weekly] average temperatures in the 16-18°C range for multiple days."  EPA 1 at 000055.  Additionally, NMFS calculated these rivers with small diurnal variation were the equivalent to 17.0-17.5°C (constant).  EPA 972 at 027039.  And, the record shows many species use these rivers with low diurnal variation at peak summertime temperatures, some as holding adults.  *See supra* at 19-20; EPA 58 at 001789, 001797-79 (three steelhead species present as holding adults).  Despite the acknowledged presence of these fish, EPA neither explained how the 18°C criterion protects them, nor bothered to identify where these "atypical" rivers are and the uses affected.  In light of these significant shortfalls, EPA's approval of the 18°C criterion was arbitrary and capricious.

**IV.    EPA's Approval of Oregon's Use Designations Was Arbitrary and Capricious**

Once a state designates a use for a water body, the state may not remove that use if it is an "existing" use,[38] unless the state designates in its place a use with a more stringent criterion.  40 C.F.R. §131.10(h)(1).  Nor may the state remove the designation unless it determines the use is not "attainable" through a Use Attainability Analysis (UAA).  40 C.F.R. §§ 131.3(g), 131.10(d), (g), (h)(2), (j)(2).  These rules embody a "rebuttable presumption" that a use cannot be removed except under very narrowly circumscribed conditions.[39]  EPA 87 at 002709.

Though EPA's briefing confuses the issues, NWEA's argument is simple.  Oregon's old Salmonid Rearing use meant what it said: Oregon designated *all salmonid rearing uses* for all

---

[38]  "Existing use" refers to uses "actually attained in the water body on or after November 28, 1975, whether or not they are included in the water quality standards."  40 C.F.R. § 131.3(e).  This definition relates to EPA's original mandate, adopted on that date, that "[t]he State *shall maintain* those water uses which are *currently* being attained."  40 C.F.R. § 130.17(c)(2) (1977) (emphasis added).

[39]  EPA accuses NWEA of "repeatedly mischaracteriz[ing]" this rebuttable presumption. EPA Br. at 34 n.30.  EPA now claims this rebuttable presumption applies only to "general" fishable/swimmable uses.  *Id.*  Call it what EPA likes, the *same* presumption, embodied *in the UAA requirement itself*, applies not only when a state fails to designate CWA § 101(a) uses for the first time, but also when it removes any more narrow use.  40 C.F.R. § 131.10(g), (j)(1),(2).

Salmonid Rearing waters.  *See* EPA 146 at 017944.  The broad Salmonid Rearing designation encompassed many uses, and when Oregon later narrowed it to one specific use for any given water body, it removed the others.  Wherever that resulted in a less stringent criterion covering a water body, EPA's approval must be set aside.  EPA's position that Oregon's "use refinement" does not constitute "use removal" is inconsistent with the CWA and EPA's own regulations.

### A.    This Court Should Reject EPA's Argument that Oregon Should Now Be Allowed to Pick and Choose Where Its Old Designations Applied

To get around its own rules, EPA seems to be arguing that Oregon did not *remove* any uses because it had not *designated* any uses in the first place.  EPA argues it "interpreted its regulations to not require a UAA" because Oregon replaced Salmonid Rearing with "an interdependent suite of salmonid uses."  EPA Br. at 37.  Applying its new interpretation,[40] EPA argues that Oregon's new use designations are "more specific" because Oregon's "prior designations of general uses for a basin . . . indicated that these uses occurred at some places and times within the basin, but never defined when and where they occurred."  *Id*. at 38-39 n.38.

EPA thus argues, remarkably, that Oregon did not designate *any* salmonid uses for *any* particular water bodies from 1967 to 2003.  This is a surprising argument, given that EPA previously approved Oregon's designations.[41]  And the public apparently must now guess what

---

[40]  Once again, EPA cites to the Temperature Guidance as if to suggest that document embodies a long held interpretation of its own regulations.  To the contrary, it is entitled to no great deference because it was "the agency decision for all practical purposes."  *NWEA*, 2008 WL 111054 at *3.  The only other instance where EPA mentioned the concept of "use refinement" was a 1998 proposed rulemaking.  There, EPA rejected the idea that such a refinement would not require a UAA as inconsistent with 40 C.F.R. § 131.10(j)(2).  EPA 87 at 002711.  Though EPA invited comments on whether that rule should be changed, *id*., it never amended the rule.

[41]  EPA bases this argument in part on this Court's holding in *NWEA I*.  However, this Court did not hold that Oregon failed to specify where spawning or rearing was *designated*.  Instead it held the opposite, endorsing NMFS' criticism that Oregon "*misidentified* the times and places where spawning, rearing, and incubation occurred."  *NWEA I*, 268 F.Supp.2d at 1267 (emphasis added and citation to the record omitted).  This stood in contrast to Oregon's treatment of migration corridors which it simply "ha[d] not designated … for protection."  *Id*.

other uses do or do not apply where they seem to (e.g. "water contact recreation" or "public

water supply") as those are designated in the same manner as before.  Moreover, EPA

contradicts its own argument.  In the TSD, EPA explained that Oregon did not remove pacific

lamprey as a designated use because "[t]he general fish and aquatic life use applies to the whole

mainstem Columbia River (see Table 101A), which includes the Pacific Lamprey and other

resident fish (although not specifically identified)."  EPA 1 at 000084.  Oregon's broad Resident

Fish & Aquatic Life Use apparently *does* designate pacific lamprey *in* the Columbia River, but

the similarly broad Salmonid Rearing, also designated for particular water bodies, did *not*

designate, e.g., bull trout rearing, *anywhere* in particular.  EPA cannot have it both ways.

Importantly, EPA's arguments undermine the clear intent of the CWA.  As EPA

explained when it promulgated standards for Idaho:

> Protecting a use category such as "fishable," or a subcategory such as "cold water
> biota," plainly *must mean protecting all of the species-specific activities that
> occur within that category*, including the most sensitive.  The position advocated
> by commenters—that not all species or activities within a use category need to be
> protected—would lead to results that are obviously contrary to the goals of the
> Act. . . .Presumably, the commenters' approach would allow states to pick and
> choose which species within a use category are deserving of protection.

62 Fed. Reg. 41162, 41168 (July 31, 1997) (emphasis added).  Here, if states may pick and

choose what uses are covered and where, years after making their designations, they will be free

to disregard *any* use at *any* location when it suits them to remove it.  The Court should reject

EPA's attempt to renegotiate the meaning of Oregon's original broad use designations.[42]

### B.    EPA's "One Use/One Criterion" Argument Ignores EPA's Own Regulations

EPA also argues that Oregon did not remove any Salmonid Rearing uses because the

---

[42] EPA's arguments should also be rejected because Oregon plainly *did* intend to designate
Salmonid Rearing for all locations marked on its old designation tables.  When the State intended
less, it made that intent clear.  *See* Former Table 19 n.2 (limiting salmonid designations to
"[w]here natural conditions are suitable for salmonid fish use").

state's new "suite" of uses "in effect … serve as *one use* and associated *criterion* that … *better*

*protect overall* salmonid populations and salmonid uses[.]"  EPA Br. at 37 (emphasis added).

This "one use/one criterion" argument disregards the plain language of EPA's regulations.

All of Oregon's new uses, variously applied to different water bodies, simply cannot

constitute a single use.  By definition, "[d]esignated uses are those uses specified in water quality

standards *for each water body or segment*[.]"  40 C.F.R. § 131.3(f) (emphasis added).   As such,

one must look to the specific water body at issue to determine the designated use.  The same is

true for criteria.  By definition, "[c]riteria are *elements* of State water quality standards . . .

representing *a quality* of water that supports a *particular use*."  40 C.F.R. § 131.3(b) (emphasis

added).  Here, the particular "elements" and qualities identified by Oregon's new standards are

individual temperatures.  And the "particular uses" that they support, as above, are identified for

particular water body segments.  Further, throughout 40 C.F.R. § 131.10, EPA discusses the

removal and "refinement" of uses in terms of prohibiting changes to *specific locations*.[43]

Nowhere does better "overall" protection even factor into the regulatory analysis.[44]

EPA now turns this regulatory regime on its head.  Under EPA's theory, instead of asking

whether a previously designated use is attainable or if it is an existing use that cannot be

---

[43]  *See, e.g.,* 40 C.F.R. § 131.10(f) (referring to removal as "reclassifying a *water body or segment thereof* to uses requiring less stringent water quality criteria.") (emphasis added); 40 C.F.R. § 131.10(h)(1) (An existing use may not be removed "unless *a use* requiring more stringent criteria is added[.]") (emphasis added).

[44]  EPA's regulations address both use removal and sub-categorization in terms of preserving the *entirety* of the prior use at the location where it is designated.  In particular, "States may … establish sub-categories of *a use* if the State can demonstrate that attaining *the designated use* is not feasible[.]"  40 C.F.R. § 131.10(g) (emphasis added).  Here, "the designated use" plainly refers back to the original designated use to be narrowed.  As such, a state must clearly determine if all the uses within that broader designation can be feasibly attained in their current location.  *See also* EPA 91 at 03020 ("The State may demonstrate that, *for a specific water body*, such parameters as … temperature will not support trout but will support perch[.]") (emphasis added).

removed, a state may ask whether some other use, at some other location, will be better protected "overall" even if the *designated* use is removed.  This is contrary to EPA's rules.

### C.    EPA's Appeal to Best Available Science Must Be Rejected

Rather than following its own regulations, EPA appeals to best available science and the protection of "potential" uses.  EPA Br. at 35, 36, 40, 42.  However, it remains clear that Oregon did not satisfy the very statutory imperatives EPA's regulations are meant to address.

First, of course NWEA supports using best science, but a UAA involves more than just examining the best data available.  Instead, UAAs serve a specific policy goal of the statute and are designed to determine if attainment is "feasible," a defined term.  40 C.F.R. § 131.10(g).  This requires, for example, an assessment of whether "[h]uman caused conditions or sources of pollution prevent the attainment of the use and cannot be remedied[.]" 40 C.F.R. § 131.10(g)(3).

Second, EPA's new concept of a "potential" use is no substitute for the required inquiry into "existing" (post-1975) species distributions and water quality, which also has a specific policy goal.[45]  *See* EPA 87 at 002713 (explaining that existing use status depends on whether the limiting water quality problems have been in existence prior to November 28, 1975).  For example, Oregon designated Core Cold Water Habitat only where minimal, currently-observed use is present in summer and where current peak 7DADM temperatures stay below 16ºC.  EPA 1 at 000079.  By definition, that does not include areas degraded since 1975 where that use was but

---

[45]  EPA suggests that NWEA contradicts itself by arguing both that Oregon illegally removed existing uses and that designated uses may not encompass all existing uses.  EPA Br. at 40.  This is no contradiction.  As discussed further below, existing uses are separately protected under the antidegradation policy because a state may have neglected to include existing uses or be precise in its use designations at the outset.  40 C.F.R. § 131.12(a)(1), (2).  Thus, through application of the antidegradation policy, a state's investigation ensures protection of all designated *and* existing uses.  On the other hand, when a state seeks to redefine its designated uses, the law requires an investigation to ensure the state is not removing any existing uses that *were* previously encompassed by those designations.  40 C.F.R. § 131.10(g), (h)(1); *see also* EPA 87 at 002712 (explaining how existing use provisions in § 131.10 and § 131.12 work together).

is no longer present. *See id*. at 000085 (declining to use historic distribution as indicator of potential use). Oregon also no longer designates bull trout uses for the Crooked River Subbasin where access became impossible *in 1983* upon completion of the Opal Springs Diversion Dam. *See* Former Table 9; FWS 180 at 01889. Like it or not, however, these existing uses simply cannot be removed.

Last, EPA incorrectly characterizes ODFW's fish distribution database as reflecting "historic use." *See* EPA Br. at 43. Bull trout provide one example. Prior to 1995, statewide information on bull trout existed at only a very coarse level. EPA 101 at 013413. In 1997, Oregon sought better statewide data, but its results were hampered by "inconsistent standards dictated by immediate and/or local needs."[46] *Id*. These delays undermine any effort to determine uses in 1975 based on *recent* bull trout sightings because in some basins, many bull trout populations were extirpated *between* 1975 and 1997.[47] Likewise, EPA describes ODFW's recent "1:24K Fish Distribution" project as having identified "suitable habitat" near "documented observations" where there are "*no* known obstructions or reasons why the use would not also be present[.]" EPA 1 at 000090. But EPA's description actually demonstrates

---

[46] Similarly, in the Powder Basin, "concerted efforts" to document bull trout began in the 1990s. FWS 180 at 01965. For this reason EPA's criticism of NWEA's example of an existing use in Eagle Creek, a tributary of the Powder River, shows a deep misunderstanding of the ODFW database and the meaning of "existing use" protection. EPA criticizes NWEA's example because the run is "probably extinct" and that a mid-1980s sighting does not establish an existing use. EPA Br. at 41 n.40. Here, EPA apparently believes the burden of proof to protect existing uses falls on the public, none of whom "provided EPA with[,] specific information concerning any particular waterbody in Oregon where the existing use of that waterbody (*as demonstrated by data or information* that the quality of water since 1975 has been that which would support a particular use) is not protected by the time and place use designations in Oregon's rule." EPA Br. at 36 (quoting EPA 1 at 000036) (emphasis added and brackets in original). However, that extirpation, within the period defined as existing use, *is the point* of the example, and such "data" were not available to the public because the Powder Basin had not been surveyed until the 1990s. Hence the need for a UAA to elicit information and ensure no existing uses were removed.
[47] *See, e.g.,* FWS 180 at 01858 (noting that between 1967 and 1997 almost 40% of *known* Klamath Basin populations went extinct while others were not discovered until 1992).

ODFW never evaluated *when* the limiting water quality conditions began.  Thus, EPA incorrectly implies the ODFW database covers uses dating to 1975, let alone historic uses.

In short, despite EPA's protest that NWEA "ignores the comprehensiveness and protectiveness" of Oregon's new uses, EPA Br. at 43, EPA's UAA and existing use provisions are the *only* two regulatory standards that govern use removal.   While the idea of one broad use being exchanged for a "suite of uses" may be superficially appealing, this avoids answering the very questions EPA's regulations require – questions that set a "high threshold" to ensure CWA goals are "not abandoned without appropriate cause."  EPA 87 at 002709.  For all of the above reasons, NWEA is entitled to summary judgment on Claim 3.  EPA's approval must be set aside for every water formerly designated for Salmonid Rearing that is now subject to a criterion less stringent than 17.8°C because Oregon did not perform a UAA nor attempt, in many instances, to identify existing uses.

## V.    EPA's Approval of Oregon's Antidegradation Policy and Implementation Methods Was Arbitrary and Capricious

Protection of existing uses is the critical "floor" of water quality protection – whether through the use re-designation process discussed above, or through a state's antidegradation requirements.  EPA's approval of Oregon's antidegradation policy and implementation methods was arbitrary and capricious because neither ensures protection of existing uses.

### A.    Oregon's Antidegradation Policy Does Not Protect Existing Uses

EPA defends Oregon's antidegradation policy as protecting existing uses based on its "purpose" statement.  EPA Br. at 44-45 (citing OAR 340-041-0004(1)).  As the federal government is usually quick to point out, however, a goal or policy statement creates no binding or enforceable requirements.  *See, e.g., Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 72 (2004) (holding "will do" projections by an agency are not legally binding commitments); *Nat'l*

*Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 178 (D.C. Cir. 1982) ("it is one thing . . . to announce a grand goal, and quite another . . . to mandate full implementation of that goal").  EPA also argues that "the record" shows Oregon's policy protects existing uses, but EPA cites only its own and Oregon's conclusory statements that this is so.  EPA Br. at 44-45.  EPA's unsupported and unexplained conclusions notwithstanding, the lack of substantive standards to meet the stated purpose of protecting existing uses renders that purpose meaningless.

Moreover, Oregon's regulation does not meet minimum federal requirements.  Aside from the passing reference to "existing uses" in the purpose statement, Oregon's antidegradation policy applies only to "recognized beneficial uses," which do not include existing uses for the reasons NWEA articulated in its opening brief.  *See* NWEA Br. at 41-42.  But even if this Court interprets "recognized beneficial uses" to include existing uses, Oregon has not ensured that those uses will be "maintained and protected" as required by EPA's regulations.  40 C.F.R. § 131.12(a)(1);[48] *see also PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700, 705-06 (1994) (Antidegradation policies must "be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation.").  Preventing uses from being "unacceptably threaten[ed] or impair[ed,]" OAR 340-041-0004(9)(a)(C), is not the equivalent of "maintain[ing] and protect[ing]" existing uses.  40 C.F.R. § 131.12(a)(1); *see also* EPA 178 at 019363 (interpreting "maintain and protect" to require *full* protection of existing uses).  EPA argues that "unacceptably" is fairly read to allow only *de minimis* threats or

---

[48]  EPA correctly notes that NWEA's opening brief inadvertently quoted 40 C.F.R. § 131.12(a)(2), which requires, *inter alia*, "water quality adequate to protect existing uses fully," rather than subsection (a)(1), which requires that existing uses "be maintained and protected." NWEA's argument remains the same, however, because both (a)(1) and (a)(2) require protection of existing uses.  EPA interprets the requirement that existing uses "be maintained and protected" under 40 C.F.R. § 131.12(a)(1) (Tier 1) as allowing water quality to be lowered "to the level required to *fully* protect the existing use. . . ."  EPA 178 at 019363 (emphasis added).

impairments.  EPA Br. 45 n.45.  However, Oregon does not define "unacceptably;" nor do the regulations or Oregon's "implementation methods" provide a method for determining if a threat or impairment is "unacceptable."  EPA cannot presume, in the absence of clear standards from Oregon, that "acceptably" means truly *de minimis*.  *See, e.g.,* 61 Fed. Reg. 169 at 45383 (disapproving Pennsylvania's methods because "in practice, Pennsylvania's policy of 'no adverse measurable change' could allow potentially significant discharges and loading increases from point and nonpoint sources"); EPA 91 at 003089 (cautioning against EPA approval of methods that "can be implemented in such a way as to circumvent the intent and purpose of the antidegradation policy").  EPA's approval of Oregon's antidegradation policy was thus arbitrary and capricious.

B.    **EPA's Approval of Oregon's Antidegradation Implementation Methods was Arbitrary and Capricious**

In prior litigation, this Court ruled that EPA should have promulgated implementation methods for Oregon because Oregon's standards "d[id] not contain even a semblance of an implementation plan[.]"  *NWEA I*, 268 F.Supp.2d at 1265.  In response, Oregon incorporated by reference a guidance document (Internal Management Directive or "IMD") it had finalized prior to the Court's ruling and the water quality standards revisions at issue in this case.  For the first time, in its brief, EPA takes the position that it did not, in fact, approve the IMD, nor was it required to act on Oregon's implementation methods.  EPA's argues that 1) since states need only "identify" implementation methods under 40 C.F.R. § 131.12(a), such methods may be either within or outside state water quality standards, and 2) if the methods are outside the regulations, they are not subject to EPA approval or disapproval action.  This *second* argument is inconsistent with the CWA, EPA's prior interpretations of its own regulations, and the history of this case.

As far as NWEA is aware, until now, EPA has always interpreted its rules to require EPA action on antidegradation implementation methods.  According to EPA's Water Quality Standards Handbook, regardless of their location, EPA will *disapprove* implementation methods if they can circumvent the intent and purpose of the antidegradation policy.  EPA 91 at 003089; *see also, e.g.,* 61 Fed. Reg. 169 at 45382 (disapproving Pennsylvania's implementation methods, which were based on a state handbook not referenced in the regulations that had to be read together with "[t]he Code . . . to understand the effect of the . . . policy"); Region 9 Guidance on Implementing the Antidegradation Provisions (June 3, 1987) at 1, *available at* http://water. epa.gov/scitech/swguidance/waterquality/standards/adeg/upload/Region9_antideg_guidance.pdf ("The Agency expects States to develop and document these criteria in their antidegradation implementation procedures, *for review and approval* by EPA regional offices.") (emphasis added).  EPA's position to the contrary, apparently advanced for the first time regarding Oregon's implementation methods, should be rejected.  *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 469 (1987) ("An agency interpretation . . . which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (internal quotation and citations omitted).[49]

Moreover, the record belies EPA's assertion that it did not approve the IMD.  Although EPA claims it approved only select pages referenced in Oregon's rules (IMD pages 27 and 33-

---

[49]  EPA's departure from its long-held interpretation has a tautological result.  EPA argues it had no obligation to act on the IMD because it is just guidance.  The fact that it is just guidance lacking any enforceable methodology to implement the antidegradation policy is precisely NWEA's point.  It is, however, the *only* document the agencies identify as Oregon's implementation methodology.  EPA 174 at 018985 ("This document provides methods and directions to be followed by the DEQ for implementing the Antidegradation Policy.").  EPA cannot allow states to have implementation methods outside their own regulations and claim the methods are immune from EPA action and judicial review while concurrently claiming such methods meet the requirement that states have methods to implement antidegradation policies.

39), the record supports a contrary conclusion.  EPA admits that it reviewed the entire IMD when deciding whether to approve Oregon's standards.  *See* EPA 1 at 000026.  EPA also cites page 25 of the IMD to support its conclusion that Oregon's Antidegradation Policy protects existing uses. EPA 1 at 000036.   Nowhere in the TSD does EPA explicitly state, as it does in its brief, that its approval of the IMD is limited to select pages.

Further, EPA's position undermines this Court's ruling in *NWEA I.*  This Court's ruling was based on the premise that EPA must promulgate implementation methods, "a required element" of water quality standards, when Oregon fails to do so.  *See NWEA I*, 268 F.Supp.2d at 1265.  For EPA to be correct that it was not required to act on Oregon's implementation methods, then this Court must overrule its earlier conclusion.  If, on the other hand, EPA was required to act on Oregon's implementation methods, then EPA fails to explain how limiting its action to select pages of the IMD complies with the Court's order.  *See id.* ("EPA is ordered to promulgate an antidegradation implementation plan for Oregon's waters"); *see also* Final Judgment, CV-01-510-HA, August 13, 2003 (Docket # 145) at 2 ("It is Ordered and Adjudged as follows. . . [EPA] shall either sign final regulations or approve final State regulations . . . with regard to . . . methods for implementing the antidegradation policy adopted by Oregon, pursuant to 40 C.F.R. § 131.12[.]").  The directions from this Court could hardly be more clear, and EPA's attempt to evade those orders should be rejected.

Regardless of whether EPA approved all or part of the IMD, that approval was arbitrary and capricious because Oregon's implementation methods are not sufficient.  *See* NWEA Br. at 43- 45.  Relying solely on its argument that it "did not make an approval decision on the IMD that is subject to a challenge" by NWEA, EPA fails to respond to NWEA's arguments.  EPA Br. at 47.  This Court should look beyond EPA's shell game and conclude that EPA's approval of

Oregon's antidegradation policy and implementation methods was arbitrary and capricious, NWEA is entitled to summary judgment on Claims 9 and 10.

## VI.  Oregon's Water Quality Standards Do Not Protect Imperiled Species

### A.  Risk to Threatened and Endangered Species is a CWA Issue

In approving Oregon's water quality standards, EPA failed to adequately consider the imperiled status of the species, an obligation EPA had *under the CWA*.  EPA accuses NWEA of conflating EPA's CWA and ESA duties.  *See, e.g.*, EPA Br. at 49 n.49.  But NWEA is not attempting to import the ESA standards to the CWA.  Rather, NWEA argues that the CWA duty to fully protect uses requires EPA to consider that uses on the verge of extinction, or local extirpation, can sustain less risk than healthy uses.  At every turn, EPA erred on the side of more risk, and its approval must be set aside under the CWA.

NWEA has discussed extensively the CWA's mandate to protect "existing" uses – that is, uses as they existed and where they existed in 1975.  *See supra* at 28-38.  The uses at issue in this litigation, salmon, steelhead, bull trout, *both* as species *and* as individual, smaller populations, were, to say the least, in much better shape in 1975 than they are today.  Salmonid populations have declined precipitously; many salmon runs and resident bull trout populations are threatened or endangered; and some isolated populations are now so small that their current status is "a question mark." FWS 180 at 01965; *see also* FWS 2 at 00124; NMFS 2 at 8-20.  In addition to their depleted status, the quantity and quality of salmonids' habitat is also severely damaged.  *See, e.g.*, EPA 140 at 016494; FWS 180 at 01841.  There is simply much less habitat than historically was available to salmonids and the habitat remaining is seriously degraded, including by temperature.  EPA 136 at 015474-75.  Present and further degradation will likely have severe impacts for years to come.  *See* FWS 227 at 04762 (noting that riparian vegetation

key to salmonid habitat is "easily altered by land use practices [whereas] . . . *recovery can require decades to centuries*.") (emphasis added); EPA 1121 at 033863.

Additionally, major temperature sources not typically regulated under the CWA also threaten salmonid populations in other significant ways. For example, the hydropower system has caused "the biggest increase in columnaris disease in the Columbia[,]" EPA 123 at 014637, 39, and major increases in salmonid predation. *See also*, EPA 121 at 014582. And water withdrawals, particularly in eastern Oregon, cause soaring temperatures and dry up streams. EPA 146 at 017972; EPA 143 at 017286; EPA 58 at 001797 n.6. In short, salmon face, at least for the foreseeable future, serious obstacles to their survival. EPA 143 at 017651.

The imperiled status of the species and degraded state of their habitat means we have failed to prevent the backsliding as Congress intended under the CWA. We have let things dip below that 1975 "absolute floor" of CWA protection. EPA 178 at 019363. As a biological matter, our failure means these populations are now highly vulnerable and cannot withstand the same stresses that healthy populations might otherwise withstand. EPA 1070 at 031922 ("Small populations face a host of risks intrinsic to their low abundance; conversely, large populations exhibit a greater degree of resilience."). As a legal matter, the CWA's existing use requirements prohibit EPA from incorporating this failure into water quality standards. Rather, the CWA mandates that, at a minimum, Oregon and EPA make decisions to bring the water quality to a level that supported healthy uses as they were in 1975, and to recover local populations that existed, even in an unhealthy state, at that time. 33 U.S.C. § 1251(a); 40 C.F.R. §§ 131.3(e); 131.6(d); 131.10(a) & (d); 131.12(a)(1); EPA 87 at 002712; EPA 91 at 003088, 90.

To be sure, EPA cannot control the Columbia River hydropower system or water withdrawals in eastern Oregon. But EPA must consider these obstacles for salmonids when EPA

employs the key tool it *does have* – determining what water quality standards are necessary to support these uses as they existed in 1975. That is, where EPA has the choice to pick a level of risk to the species whose status is grave, it must err on the side of less risk. As NWEA pointed out in its opening brief, EPA itself has recognized a need to build in an extra margin of safety for threatened or endangered species. 62 Fed.Reg. 41,162, 41169 (July 31, 1997). EPA correctly equated the required "full support" of the "use" under the CWA with ensuring the health and survival of species populations. *Id*. That level of analysis, however, is simply absent from EPA's decision record for Oregon.

### B.    EPA's Decisions Did Not Account for the Vulnerable State of the Species

EPA notes the agencies involved developed the Temperature Guidance to protect threatened and endangered species. EPA Br. at 49. The original scientific basis for the Temperature Guidance, however, did not drive its ultimate recommendations or EPA's review of Oregon's standards. Rather than include a margin of safety for species faced with extinction, EPA sought to avoid making decisions that could be viewed as overly protective. FWS 570 at 10883. Notably, John Palmer, Senior Policy Advisor for EPA Region 10 and the "primary author" of the Temperature Guidance (Docket # 103 at ¶¶ 1-2) counseled against "compounding conservatism" in the choices the agencies were making. *Id*; *see also* EPA 611 at 023125. Thus, rather than compounding biologically conservative choices, EPA compounded the risk to species. As one of the key scientists in the development of the Temperature Guidance, appealing to Mr. Palmer, stated:

> What I see more and more is a distancing from the original policy goals and technical interpretation of those goals, replaced by a free-form . . . standards-setting with the use of only crude models if any, reliance on current rather than historic fish distributions, the option to demote the beneficial use of a reach based on weak information, and increasing bag of exceptions, . . .and [an] effort to

> ride the edge of lethality. . . . I don't think the way to accommodate
> [perception problems] is to go even further out on a limb and
> entertain more risks.

EPA 747 at 024547.  Thus, the Temperature Guidance strayed from where even those intimately

involved thought is should head.  Oregon's standards development followed suit, making even

more concessions to risk, and EPA approved Oregon's choices.  Among the risky choices they

made were:

- Exempting nonpoint sources, the primary sources of temperature increases, from complying with numeric criteria.  *See supra* at 1-6; NWEA Br. at 9-11.

- Allowing numeric criteria to be wholly overridden where the state determines (without reliable methods and without subsequent EPA approval) that the "natural" thermal potential of the waterbody was hotter (but not cooler) than the applicable criterion.  *See supra* at 7-13; NWEA Br. at 27-31.

- When faced with a range of temperature choices for each salmonid life cycle stage, choosing numeric criteria at or above the upper end of optimal temperatures for that life cycle stage.  *See supra* at 13-28; NWEA Br. at 5, 16-26, 46.

- Making assumptions, despite a remarkable absence of evidence to support such sweeping generalities, that 1) all rivers are cooler upstream such that fish experience warmest temperatures only at a river's lowest reach, 2) all rivers will be protectively cool enough when the relevant fish life stages occur, and 3) the state can or will identify and be able to protect sufficient cold water refugia.  *See supra* at 13-28; NWEA Br. at 16-26, 44-47.

- Applying the most protective criteria to very few waters, and otherwise making use designations based on *current* species distributions rather than where uses were existing in 1975.  *See supra* at 28-34; NWEA Br. at 32-39.

- Paying only lip service to protecting existing uses through Oregon's antidegradation policy and implementation methods, which *should be* the saving mechanism by which individual state regulatory decisions ensure existing uses are protected.  *See supra* at 34-38; NWEA Br. at 40-45.

These choices led to a compounding of risk and overall failure to truly protect species for

which water temperature is a key habitat quality.  Two examples serve to illustrate.  The first

involves the salmonids which travel from natal streams to the ocean and back again, through

warm midreaches and mainstems. These heavily altered waters, for which EPA approved suboptimal temperatures of 18°C and 20°C, are not just thermal gauntlets for migrating adults and juveniles. This is also where juveniles must rear, growing enough to survive, *inter alia*, cold winters, exposure to disease, and predators. EPA 136 at 015487-8. Those species and populations that rear and migrate in 18°C and 20°C criteria waters[50] during high summer temperatures reap no benefits from EPA's assurances that "most" fish will be absent and only "low densit[ies]" are present then.[51] EPA's dismissive attitude toward those fish exposed to summer high temperatures is anathema to protecting species' diversity. As NMFS cautioned EPA on the importance of early and late "tails" of migration, "[i]n order to protect and restore the genetic diversity of anadromous fish populations and recover listed species, it is vitally important that remnant portions of runs that are able to migrate earlier or later than the bulk of the population are protected and restored." EPA 736 at 024489.

The second example involves bull trout, the species most dependent on extremely cold water. To support an assertion that its decisions ensure healthy and sustainable populations, EPA relies on its approval of Oregon's bull trout use designations. EPA Br. at 49-50 (citing EPA 1 at 000080-81). Far from supporting EPA's position, the bull trout designations actually prove NWEA's point. NWEA has already identified numerous problems with Oregon's bull trout use designations. *See supra* at 28-34; NWEA Br. at 32-39. Additionally, the Court should reject EPA's last argument that Oregon's new use designations will result in healthy bull trout

---

[50] NMFS concluded 18°C criterion waters will expose two coho and three steelhead species to hazards of suboptimum conditions. EPA 58 Att. 1 at 001807. And 20°C criterion waters will create disease risk and reduced gamete viability in two chinook and three steelhead species. *Id.*

[51] EPA approved the 20°C criterion for waters where "*most* migrating adults and *nearly all* migrating juveniles (*except* for late migration fall chinook), will migrate through these [20°C] waters during" non summer months. EPA 1 at 000056 (emphasis added). EPA recommended the 18°C criterion apply to areas where there is "moderate to low density salmon and trout juvenile rearing" during summer. EPA 104 at 013554.

populations simply because they include some of FWS's proposed critical habitat designations.[52]

As with the State's failure to provide any core cold water habitat, except in extremely narrow

circumstances, Oregon did *not* include FWS's critical habitat proposals for migration, which it

deemed necessary for long-term recovery.  EPA 100 at 013221, 013242.[53]  EPA has not

explained why excluding those uses is justified, especially in basins where bull trout populations

are highly fragmented, such as the Powder.  *See* FWS 2 at 00176.  Nor has it explained why

isolated populations, at various stages of decline, will *all* benefit enough from protection only at

their headwaters to grow and be sustainable.

Additionally, FWS's proposed critical habitat designations only covered areas that

"*currently* [exhibit] elements that provide essential life-cycle requisites of the species[.]"  EPA

100 at 013219 (emphasis added).[54]  As such, even if *current* populations are protected, EPA has

not shown the same for populations close to the edge, or extirpated since 1975.  In fact, despite

EPA's argument that Oregon now provides "broader protection than just protecting current or

existing[55] uses[,]"  EPA 1 at 000081, FWS's critical habitat designations did not include "some

small scattered occurrences or habitats that are in highly fragmented areas or no longer have

hydrologic conditions that are sufficient to maintain bull trout habitat[.]"  EPA 100 at 013219.

Whether or not this approach meets ESA critical habitat designation requirements, *the CWA*

mandates the continued protection of existing uses, fragmented or not.  40 C.F.R. § 130.17(e)(1)

---

[52]  *See* 16 U.S.C. § 1532(5)(A) (defining "critical habitat" under the ESA).

[53]  *See* EPA 10 at 000504 (incorporating only FWS' proposed spawning and juvenile habitat).

[54]  These include, *inter alia*, areas of current low temperature and sedimentation, now limited by "past forest and rangeland management practices and intensive development of roads."  EPA 100 at 013212; *see also*, *id.* at 013215 ¶¶ (1), (4). Those are the very reasons, for example, why current populations "represent an estimated 21 percent of the estimated historic range in the Klamath Basin[.]"  *Id.* at 013211.

[55]  It is not at all clear that EPA means to use the term "existing uses" here as it is defined in 40 C.F.R. § 131.3(e).

(1977) ("No further water quality degradation which [will] interfere with or become injurious to existing instream water uses is allowable."), *accord* 40 C.F.R. § 131.10(h)(1).

In summary, EPA's approval decisions should be set aside because each standing alone is unsupportable and, when taken together, the standards do not fully protect the salmonid uses as required by the CWA.  NWEA is entitled to summary judgment on Claim 11.  To meet its CWA obligations, EPA's future approval decisions on any one or all of the water quality standards must evaluate and fully protect against the greater risk faced by these vulnerable populations.

## CONCLUSION

For the foregoing reasons, NWEA respectfully requests summary judgment on its claims against EPA arising under the CWA (Claims 1 through 11).  This Court should: (1) order EPA to act on Oregon's water quality standards related to nonpoint sources; (2) set aside EPA's approvals of Oregon's water quality standards; and (3) order EPA to develop and/or approve water quality standards for Oregon that will protect existing and designated uses, including listed species.

DATED this 25th day of February, 2010.

Respectfully submitted,

_____/s/ Allison LaPlante_____
ALLISON LAPLANTE (OSB # 02361)
DANIEL MENSHER (OSB # 074636)
DANIEL J. ROHLF (OSB # 990069)
Pacific Environmental Advocacy Center

Attorneys for Plaintiff