ALLISON M. LAPLANTE (OSB # 02361)
DANIEL P. MENSHER (OSB # 07463)
DANIEL J. ROHLF (OSB # 990069)
Pacific Environmental Advocacy Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219
(503)768-6894, lalplante@lclark.edu
(503)768-6926, dmensher@lclark.edu
(503) 768-6707, rohlf@lclark.edu

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL
ADVOCATES, a non-profit corporation,

       Plaintiff,

   v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, a United States
Government Agency, NATIONAL
MARINE FISHERIES SERVICE, a part of
the National Oceanic and Atmospheric
Administration, a part of the United States
Department of Commerce, and UNITED
STATES FISH AND WILDLIFE
SERVICE, a part of the United States
Department of the Interior,

       Defendants,

Civil No.: 05-1876-HA

**RESPONSE/REPLY MEMORANDUM
IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT ON ENDANGERED
SPECIES ACT CLAIMS**

**(Oral Argument Requested)**

THE STATE OF OREGON,

      Intervenor-Defendant, and

NORTHWEST PULP AND PAPER
ASSOCIATION,

      Intervenor-Defendant.

_____

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

I.   NMFS AND FWS FAILED TO ASSESS IMPACTS TO INDIVIDUAL
     SPECIES ........................................................................................................1

     A.   NMFS BiOp ..........................................................................................1
     B.   Bull trout ...............................................................................................4

II.  NMFS FAILED TO PROPERLY ASSESS EFFECTS ON CRITICAL
     HABITAT ......................................................................................................5

III. THE RECORD DOES NOT SUPPORT NMFS' NO JEOPARDY
     FINDING .......................................................................................................9

     A.   NMFS Failed To Consider Recovery In Its Assessment of
          Jeopardy ................................................................................................9

     B.   NMFS Failed To Consider Impacts to Existing Degraded Conditions......9

     C.   NMFS Failed To Consider Cumulative Effects.........................................16

     D.   NMFS' Individual Conclusions for Each Contradict the Record….. .......17

          1.   Salmon and Steelhead Spawning through Fry Emergence.........17

          2.   Steelhead Smoltification ...............................................................20

          3.   Salmon and Steelhead Migration Corridors Use ..........................21

          4.   Intergravel Dissolved Oxygen Criterion .......................................21

ii

IV.    THE RECORD DOES NOT SUPPORT FWS' NO JEOPARDY FINDINGS….23

    A.  FWS' Arbitrarily Concluded the 12°C Criterion Will Not Adversely Affect Bull Trout.........................................................................................................23

    B.  The Record Does Not Support FWS' Assertion That the 20°C Criterion Lahontan Cutthroat Trout and Redband Trout Criterion Is Not Likely to Jeopardize Bull Trout.......................................................................................27

V.     THE SERVICES' INCIDENTAL TAKE STATEMENTS ARE UNLAWFUL BECAUSE THEY CONTAIN INVALID TRIGGERS FOR THE RE-INITIATION OF CONSULTATION………..…………………………………..28


CONCLUSION..................................................................................................................30

**TABLE OF AUTHORITIES**

CASES

*Aluminum Co. of America v. Administrator, Bonneville Power Administration*,
   175 F.3d 1156 (9th Cir. 1999) .......................................................................15
*American Rivers v. NMFS*,
   1997 WL 33797901 (D. Ore., 1997).........................................................6, 8
*American Rivers v. U.S. Army Corps of Engineers*,
   271 F.Supp.2d 230 (D.D.C. 2003)………………………………………………16
*Arizona Cattle Growers Ass'n v. FWS*,
   273 F.3d 1229 (9th Cir. 2001) ................................................................ 29-30
*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007)........................................................................................29
*Center for Biological Diversity v. Kempthorne*,
   2008 WL 659822 (D. Ariz. March 6, 2008) ....................................................5
*Forest Service Employees for Env'l Ethics v. USFS*,
   726 F.Supp.2d 1195 (D.Mont. 2010)...............................................................1
*Cold Mountain v. Garber*,
   375 F.3d 884 (9th Cir. 2004) .........................................................................30
*Erikson v. Pardus*,
   551 U.S. 89 (2007)..........................................................................................29
*Friends of the East Fork, Inc. v. Thom*,
   688 F.Supp.2d 1245 (W.D. Wash. 2010).......................................................13
*Gifford Pinchot Task Force v. U. S. Fish and Wildlife Service*,
   378 F.3d 1059 (9th Cir. 2004) ...........................................................5, 6, 7, 8
*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................4, 20
*NRDC v. Daley*,
   209 F.3d 747 (D.C. Cir. 2000) .......................................................................28
*National Wildlife Fed'n v. NMFS*,
   524 F.3d 917 (9th Cir. 2008) ..............................................7, 8, 9, 10, 11, 13
*Northwest Ecosystem Alliance v. U.S. Fish and Wildlife Service*,
   475 F.3d 1136 (9th Cir. 2007) ......................................................................4
*Or. Natural Dessert Ass'n. v. Tidwell*,
   716 F.Supp.2d 982 (D.Or. 2010) ...................................................................10
*Or. Nat. Res. Council v. Allen*,
   476 F.3d 1031 (9th Cir. 2007) ..................................................................28, 30
*Pacific Coast Fed'n of Fisherman's Ass'ns*,
   426 F.3d 1082 (9th Cir. 2005)……………………………………….…..…..3
*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) .......................................................................23
*Skaff v. Meridien North American Beverly Hills*,
   LLC, 506 F.3d 832 (9th Cir. 2007)................................................................29
*S. Yuba River Citizens League v. NMFS*,
   723 F.Supp.2d 1247 (E.D.Cal. 2010).........................................................3, 10
*Swan View Coalition v. Barbourletos*,

iv

No. CV 06-73-M-DWM, 2008 WL 5682094 (D. Mont. Jun. 16, 2008) ..........................13

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010)………………………………………………………21
*Wynder v. McMahon,*
    360 F.3d 73 (2d Cir. 2004)................................................................................30

## STATUTES

16 U.S.C. § 1533.................................................................................................4
16 U.S.C. § 1536(a)(2)...............................................................................20, 27
16 U.S.C. § 1536(b)(4)(A).................................................................................29

## RULES AND REGULATIONS

50 C.F.R. § 17.3………………………………………………………………23
50 C.F.R. § 402.14............................................................................................20
50 C.F.R. §402.14(g)(4)...............................................................................16, 17
50 C.F.R. §402.14(h)(2)....................................................................................21

FRCP 8(a) .......................................................................................................29

## FEDERAL REGISTER AND CONGRESSIONAL RECORDS

61 Fed. Reg at 4724 (Feb. 7, 1996)......................................................................4

63 Fed. Reg. 31693 (June 10, 1998) .....................................................................4

64 Fed. Reg. 58,910 (Nov. 1, 1999)..................................................................4, 5

## INTRODUCTION

Plaintiff Northwest Environmental Advocates (NWEA) herein responds to Federal Defendants' opening brief, and their defense of the U.S. Fish and Wildlife Service's (FWS) and National Marine Fisheries Service's (NMFS) favorable review of the U.S. Environmental Protection Agency's (EPA) approval of water quality standards for Oregon's rivers and streams.

In their opening brief, Defendants assert that plaintiff's arguments "amount to nothing more than a disagreement with the Services' scientific judgment." Def. Br. at 1. However, this case raises many legal issues that have nothing to do with scientific judgment. Additionally, where NWEA does take issue with the Services' biological determinations, NWEA does not ask this Court to referee scientific disputes. Rather, the key question before the Court in each instance is straightforward: Can the Services point to analyses and evidence in the record that provide a rational basis to support the agencies' conclusions?

## I.    NMFS and FWS Failed To Asses Impacts To Individual Species

### A.    NMFS BiOp

NMFS argues that its 58 page BiOp – a length less than one tenth of one *chapter* of its most recent BiOp on federal dam operations in the Columbia and Snake Rivers – adequately describes the status of 14 listed salmon and steelhead ESUs and analyzes whether those species will be jeopardized or their critical habitat destroyed or adversely modified. This brevity is in large part due to the fact that NMFS made no effort to detail how Oregon's new standards will affect individual ESUs differing greatly in population and geography. *Cf. Forest Service Employees for Envt'l Ethics v. USFS*, 726 F.Supp.2d 1195, 1224 (D.Mont. 2010) (setting aside FWS' BiOp because the agency "sought to simplify its consultation responsibility by providing a superficial analysis for 181 threatened or endangered species"). Justifying its detail-free

analysis, the agency now offers two jusifications – Oregon's standards protect the most sensitive

uses, and adverse impacts on *all* ESUs will be "localized, small in magnitude, or short in

duration." Def. Br. at 14. Neither justification withstands scrutiny.

First, Oregon's water quality standards do *not* ensure protection for the most sensitive

use. The 18°C standard for "juvenile rearing and migration use" does not protect juvenile

rearing, as the BiOp admits. *See* NMFS 2 at 44 ("sublethal adverse effects are possible for

holding adults and rearing juveniles," from exposure to 18°C waters) (citing Table 2, p. 35)

(showing that 18°C is well above optimal for rearing). NMFS did not concur with EPA's "not

likely to adversely affect" determination for the 18°C standard's impacts on five ESUs[1] because

Oregon over-designated that standard. *Id.* at 45; *see also id.* at 44 (the 18°C designation "could

correspond to warmer than natural conditions in a limited number of times and places"). NMFS

also found that adverse impacts to the same five ESUs were likely because Oregon under-

designated 16°C core coldwater habitat. *Id.* at 43-44.[2]

Additionally, NMFS erroneously asserts that Oregon's water quality standards reflect

"the unique distribution and run timing of each listed species." Def. Br. at 15. However, the

interagency team specifically declined to base spawning standards on actual fish distribution and

behavior, describing that approach as "overly complicated and difficult to implement." NMFS 2

at 40. Instead, Oregon adopted a general set of assumptions for the runs' geographic occurrences

---

[1] The five ESUs include Oregon coast and southern Oregon/northern California coho, and mid-Columbia, lower Columbia, and Snake River steelhead. *See* NMFS 2 at 43, 45.
[2] Similarly, NMFS found that Oregon's intergravel dissolved oxygen criterion ("IGDO") standard "may not provide adequate levels of IGDO for embryos and alevins of listed salmon and steelhead at all times (particularly during the brief period of maximum summer water temperature) and in all places used for spawning and incubation." NMFS 2 at 32. NMFS also found adverse impacts from Oregon's human use allowance and the thermal plume limitations, exceptions to its standards. *See* NMFS 2 at 49, 51-52. And despite EPA's recommendation to designate a 14°C standard for steelhead smoltification, Oregon did not do so, a decision NMFS now asserts is likely to adversely affect steelhead. *See Id*. at 41; Def. Br. at 24-25.

and timing. *Id*. at 39-40.  This administratively simpler scheme came with a significant tradeoff: NMFS noted that "spawning may begin earlier and/or emergence may end later" than Oregon's generic designations imply.  *Id.*  at 40.  NMFS rationalized this timing difference as affecting only "a period of lesser use" (defined as up to 30% of spawning), and noted the standard allows for the criterion period to begin two weeks after spawning begins, or the actual date of earliest spawning if the two weeks after first spawning encompasses "peak use" (defined as 70-100% of spawning).[3]  *Id*.

Next, NMFS discounted all impacts as "localized, small in magnitude, or short in duration." Def. Br. at 14.  However, NMFS provides no citation to support this assertion other than a page in its BiOp containing precisely the same language. *See id*. The agency identifies no scientific studies, biological analyses, or any other information in the record that substantiates its findings that: a) all adverse impacts will be "localized," small, or short-term; or b) even assuming this is so, such impacts will not cause jeopardy or destroy or adversely modify critical habitat for *any* listed ESUs or *any* critical habitat.  In short, NMFS has provided no evidence that its broad, detail free discussion does not "mask individual effects rather than measure them."  *S. Yuba River Citizens League v. NMFS*, 723 F.Supp.2d 1247, 1265 (E.D.Cal. 2010).

The Services may not "implicitly conclude that a species would not be jeopardized by a proposed activity" without articulating a rational basis in the record for such a conclusion.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,* 426 F.3d 1082, 1091 (9th Cir. 2005).  Here, NMFS has discounted impacts despite Oregon's overly generic designations, it has not assessed individualized impacts to each species, and it has not "articulat[ed] a rational

---

[3] There is other clear evidence that the standards do not protect all species. For example, steelhead spawning *peaks* as late as June or July in the Willamette and Clackamas rivers.  *See* NMFS 266 at 4.  Those uses are not protected by Oregon's 13°C criterion for spawning through fry emergence because application of this criterion ends, throughout the Willamette Basin, no later than June 15th.  NMFS 2 at 40.

connection between the facts found and the choices made." *See Motor Vehicles Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983). NMFS' conclusions, therefore, are arbitrary. *See id.*

### B.        Bull trout

In its brief, FWS argues that it need not analyze Klamath and Columbia Basin bull trout as separate distinct population segments (DPSs) under section 7 because bull trout became a single "coterminous" DPS through its 1999 listing of two additional DPSs. Def. Br. at 12 (citing 64 Fed. Reg. 58,910 (Nov. 1, 1999)) (listing the Coastal-Puget Sound and St. Mary-Belly River DPSs). However, even a cursory reading of the agency's listing determinations for bull trout demonstrates that FWS' position lacks merit.

To the extent that FWS argues its 1999 listing "amended" the five separate bull trout DPSs into a single "coterminous" DPS, the agency's action was unlawful. *See* Def. Br. at 13. FWS' own 1996 DPS policy makes clear that "the Act provides no basis for applying different standards for delisting than those adopted for listing." 61 Fed. Reg. 4722, 4724 (1996).[4] The Services must follow notice and comment procedures before listing or delisting a species. 16 U.S.C. § 1533. FWS did not follow those procedures in this case because the process resulting in the 1999 listing did not make it clear that the agency was delisting the DPSs.

Additionally, FWS *itself* asserted that there are five bull trout DPSs in the very document it points to – its 1999 proposal to list the Puget Sound and St. Mary DPSs.[5] FWS could not, therefore, simply abandon these five DPSs in its 1999 decision and ignore the scientific

---

[4] *See also Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) (upholding the DPS policy as applied to the FWS's denial of a petition to list a species as a DPS).

[5] In that rulemaking, FWS acknowledged "[t]he best available scientific and commercial information supports designating five distinct population segments (DPSs) of bull trout in the coterminous United States—(1) Klamath River, (2) Columbia River, (3) Coastal-Puget Sound, (4) Jarbidge River, and (5) St. Mary-Belly River"). 63 Fed. Reg. 31693, 31695 (June 10, 1998)

information that necessitated separate DPS listing in the first place.  Not surprisingly, FWS' final listing decisions have been struck down for contradicting an earlier listing notice.  *See, e.g. Center for Biological Diversity v. Kempthorne*, 2008 WL 659822, at *7-8 (D. Ariz. Mar. 6, 2008).

Last, even if FWS lawfully lumped the DPSs into a "coterminous" listing, it noted in the 1999 preamble that it would still conduct section 7 consultation for bull trout at the level of the five DPSs it identified.  64 Fed. Reg. at 58912 ("[i]n recognition of the scientific basis for the identification of these bull trout population segments as DPSs, and *for the purposes of consultation* and recovery planning, we will continue to refer to these populations as DPSs") (emphasis added).[6]  FWS failed to follow procedures for de-listing, it acknowledged distinct DPSs in the very document that it relies upon, and it has expressly stated that it will continue to consult at the DPS level.  The agency's argument now, that it need only consult at the "coterminous" level, should thus be rejected.

## II.    NMFS Failed To Properly Assess Effects On Critical Habitat

In July 2010, NMFS sought a remand of its BiOp (which this Court denied), acknowledging that its analysis of whether approval of Oregon's water quality standards constitutes destruction or adverse modification was inconsistent with *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*,  378 F.3d 1059 (9th Cir. 2004).  *See* Doc. #s 224-27, 248. Apparently having had a change of heart, NMFS now argues that its BiOp in fact adequately analyzed impacts to critical habitat.

---

[6] Moreover, even if the "coterminous" listing turned the five separate DPSs into five separate recovery units, FWS's Consultation Handbook provides that the agency can conduct the section 7 analyses at the recovery unit level. Section 7 Consultation Handbook at p. 4-36 (available at http://www.fws.gov/endangered/esa-library/pdf/CH4.PDF).

In its brief, NMFS suggests that it never took the position, as FWS once did, that both the jeopardy and "adverse modification" standards under section 7 relate only to *survival* of listed species. *See* Def. Br. at 18. This is simply untrue. In its 1995 BiOp analyzing the impacts of dam operations on listed salmon in the Columbia Basin, NMFS argued that it could equate section 7's jeopardy and critical habitat analyses because the regulatory definitions describing these two standards were essentially identical – the same rationale NMFS employed in its BiOp at issue in this case. *See American Rivers v. NMFS*, 1997 WL 33797901 (D. Ore., 1997). In *American Rivers*, the district court upheld NMFS' conflation of these two standards by emphasizing that the regulatory definitions of the standards each focused on "both survival and recovery" of listed species *Id*. This is precisely the reasoning expressly rejected seven year later by the Ninth Circuit in *Gifford Pinchot Task Force*. *See* 378 F.3d at 1069-1070 (noting that the regulations' reference to "both survival and recovery" was phrased to eliminate consideration of impacts on recovery alone). Accordingly, it is irrelevant that *Gifford Pinchot Task Force* involved a FWS BiOp whereas this case challenges a NMFS BiOp – the Ninth Circuit's decision in *Gifford Pinchot Task Force* shows that this Court should overturn NMFS' critical habitat analysis for failing to adequately consider recovery.

NMFS also points to its analysis of whether listed ESUs (lumped together) "can be expected to survive with an adequate potential for recovery" as an indication that the agency considered impacts on recovery of salmon and steelhead. Def. Br. at 18. However, this language actually helps prove NWEA's argument that NMFS failed to assess effects on recovery in analyzing whether Oregon's water quality standards destroy or adversely modify the critical habitat designated for various ESUs. The Services' joint Section 7 Consultation Handbook defines "survival" as "the condition in which a species continues to exist into the future while

retaining the potential for recovery." *See* Ch.4, p. 35 (available at

http://www.fws.gov/endangered/esa-library/index.html#consultations_policy). Accordingly, the

language cited by NMFS as describing the BiOp's analysis indicates that NMFS considered only

impacts on salmon and steelhead survival.

NMFS' BiOp does in fact mention recovery, noting that the biological requirements for

recovery of the listed ESUs would entail reaching population levels and environmental

conditions that would result in "a negligible risk of extinction" over a 100 year timeframe in light

of "local environmental variation" and other biological factors. NMFS 2 at 20.  However,

nowhere in the BiOp does NMFS purport to even *describe* the water quality conditions needed to

achieve this level of security, much less assess whether such conditions are consistent with

Oregon's water quality standards and their exceptions.

In *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir.

2007), the Ninth Circuit faulted NMFS' assessment of impacts on critical habitat in part because

NMFS completed its analysis "without knowing the in-river survival levels necessary to support

recovery." Similarly, in this case NMFS broadly outlined the level of environmental and

biological security consistent with recovery of all listed ESUs. However, NMFS considered the

impacts on critical habitat resulting from EPA's approval of Oregon's water quality standards

without knowing the water quality conditions necessary to achieve the BiOp's definition of

recovery. As a result, it was impossible for NMFS to assess whether Oregon's water quality

standards are consistent with recovery of listed ESUs. In July 2010, NMFS sought a remand of

its BiOp, acknowledging that its analysis of whether approval of Oregon's water quality

standards constitutes destruction or adverse modification was inconsistent with *Gifford Pinchot

Task Force v. U.S. Fish and Wildlife Service*,  378 F.3d 1059 (9th Cir. 2004).  *See* Docket Nos.

224-27, 248.  Now, NMFS argues it never took the position, as FWS did, that both the "jeopardy" and "adverse modification" under section 7 relate only to *survival* of listed species, and not their *recovery*.  Def. Br. at 18.  This is simply untrue.

In its 1995 BiOp on dam operations in the Columbia Basin, NMFS argued it could equate section 7's jeopardy and critical habitat analyses because its regulatory definitions were essentially identical – the same rationale in NMFS BiOp here.  *See American Rivers v. NMFS*, 1997 WL 33797901 (D. Or. 1997).  In *American Rivers*, the court upheld NMFS' conflation of these two standards because each focused on "both survival and recovery."  *Id*. at *3 This is precisely the reasoning rejected seven years later by the Ninth Circuit in *Gifford Pinchot Task Force*.  *See* 378 F.3d at 1069-1070.  Accordingly, it is irrelevant that *Gifford Pinchot* involved a FWS BiOp while this case involves a NMFS BiOp.  Under *Gifford Pinchot,* this Court should overturn NMFS' critical habitat analysis for failing to adequately consider recovery.

NMFS' BiOp does *mention* recovery, insofar as it acknowledges that recovery would require reaching population levels and environmental conditions resulting in "a negligible risk of extinction" over a 100 year timeframe in light of "local environmental variation" and other biological factors.  NMFS 2 at 20.  But nowhere does NMFS purport to even *describe* the water quality conditions needed to achieve this level of security, much less assess whether such conditions are consistent with Oregon's water quality standards and their exceptions.

In *NWF v. NMFS*, the Ninth Circuit set aside NMFS' assessment of impacts on critical habitat in part because it performed its analysis "without knowing the in-river survival levels necessary to support recovery," or "at what point survival and recovery will be placed at risk."  , 524 F.3d at 936.  Similarly here, NMFS gave only broad indications of the level of security needed for recovery of all listed ESUs.  It did not assess impacts resulting from EPA's approval

of Oregon's water quality standards and *link those impacts to* the water quality conditions

necessary to achieve the BiOp's definition of recovery.  As a result, NMFS' conclusions are

arbitrary.

**III.    The Record Does Not Support NMFS' No Jeopardy Finding**

  **A.    NMFS Failed To Consider Recovery In Its Assessment of Jeopardy**

  As NWEA explained in its opening brief, under Ninth Circuit precedent and NMFS

policy, NMFS must assess recovery in its jeopardy determinations.  *See* NWEA Br. at 14-15.

This analysis, however, is somewhat different than for critical habitat.  NMFS' policy (contained

in its "Habitat Approach" document) requires the agency to assess whether a proposed action

jeopardizes listed ESUs by "prevent[ing] or *appreciably delay[ing]* recovery."  NMFS 128 at 2

(emphasis added).  This disparity only makes it more apparent that NMFS failed to address

recovery in its jeopardy analysis.  As with its critical habitat analysis, NMFS failed to even

determine what water quality conditions are needed to meet the recovery standard, making it

impossible to assess whether adoption of Oregon's water quality standards and associated

exceptions will prevent, or *appreciably delay*, attainment of these recovery conditions.  In neither

case did NMFS perform the "full analysis" required by law.  *NWF v. NMFS*, 524 F.3d at 933.

The agency's jeopardy analysis must therefore also be set aside.

  **B.    NMFS Failed To Consider Impacts to Existing Degraded Conditions**

  Next, Defendant argues that NMFS was *precluded* from finding jeopardy because

"many" of Oregon's new standards are "improvements."  Def.'s Br. at 19, 20 (citing *NWF v.*

*NMFS*, 524 F.3d at 930).  Defendant cites Oregon's new internal gravel dissolved oxygen

(IGDO) and core cold-water standards as examples, and argues "where criteria remain

unchanged" Oregon provides "greater" protection because it revised its use designations. *Id*. at 20. This argument finds no support in the record.

First, virtually *none* of Oregon's temperature criteria "remain unchanged." Instead, Oregon raised its primary salmonid use criterion from 17.8°C to 18°C, its salmon and steelhead spawning criterion from 12.8°C to 13°C, and its bull trout spawning and juvenile rearing standard, which apply in several salmon and steelhead basins, from 10°C to 12°C.[7] Oregon's new human use allowance and thermal plume limitations permit further degradation and enhance these disparities. *See* NMFS 2 at 49-50. Additionally, Oregon's new 20°C migration standard now applies to several former salmonid rearing waters that used to be protected by a 17.8°C criterion, including the Snake, Coos, and John Day Rivers. *See* Former Tables 4, 10, 13-16.

While Oregon's new 16°C core cold-water criterion provides better protection *where it applies*, NMFS found that most of the changes noted above would likely adversely affect listed species. NMFS 2 at 45, 46, 49, 51, 53. And while NMFS allegedly performed an "honest review" because these changes will only affect "certain species and life-stages," Def. Br. at 21, NMFS entirely failed to articulate "in-river survival levels necessary to support recovery" and "*at what point* survival and recovery will be placed at risk." *NWF v. NMFS*, 524 F.3d at 936 (emphasis added). That would require NMFS to evaluate, at least, "the magnitude of the stressors' impact, *the populations' ability to tolerate* this impact, and the reason why *any* decline will not reduce the overall likelihood of survival or recovery." *S. Yuba River Citizens League*, 723 F.Supp.2d at 1267 (emphasis added). Here, not only has NMFS failed to evaluate these

---

[7] For example, in the John Day Basin the bull trout juvenile rearing standard applies to the headwaters of the North, Middle, and South Forks of the John Day River, where this Court recently noted that steelhead populations are "not viable." *Or. Natural Dessert Ass'n. v. Tidwell*, 716 F.Supp.2d 982, 991 (D.Or. 2010) (citation omitted).

factors, it disregards its own conclusion that "*any* further degradation" will likely "*significantly* reduce the likelihood of survival and recovery[.]"  NMFS 2 at 24 (emphasis added).

Throughout their brief, the Services nevertheless assert that at least some of the water quality standards approved by EPA represent an "improvement" in water quality in Oregon.  The agencies cite two types of improvement to support this contention.  First, in limited instances the standards approved by EPA are somewhat more protective than Oregon's previous standards.  *See* Def. Br. at 20 (e.g. noting the 16°C (60.8° F) "core coldwater habitat" criterion in some locations replaces a broadly applicable 64°F standard).  Additionally, the Services argue that even when EPA approved a standard weaker than its predecessor, attaining the new standard (assuming that occurs) will improve water quality because current conditions, are now so degraded in some places that they fail to meet even the prior standards.  *See e.g. id.* at 34 (rivers covered by the 20°C Lahontan cutthroat/ redband trout criterion currently have temperatures exceeding that figure); *id*. at 20 (showing that streams now covered by the  20°C were previously subject to 64°F).

The Services use these improvements on paper, as well as hoped-for improvements in actual future stream conditions, to advance a remarkable argument.  According to Defendants, "[t]he test for jeopardy [under the ESA] is not whether agency action will result in ideal conditions for the species.  Rather, '[a]gency action can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition."  Def. Br. at 11, citing *NWF v. NMFS*, 524 F.3d at 930.  In other words, the Services contend that their determinations as to whether Oregon's water quality standards will jeopardize listed fish or destroy or adversely modify designated critical habitat does not depend on the *biological conditions* that those standards will produce.  Instead, the agencies argue, *as a matter of law*, that

newly approved water quality standards more protective than prior standards automatically will not jeopardize listed species or destroy or adversely modify critical habitat, regardless of the in-stream conditions the standards are meant to achieve. Similarly, the Services contend that so long as the current unlawfully degraded status of water quality in Oregon's rivers and streams must improve to meet Oregon's new standards, EPA's approval of those standards is consistent with section 7 *as a matter of law*.

These positions are not consistent with the ESA, the Services' own findings, or even common sense. The Services argue in their brief that the 20°C Lahontan cutthroat/redband trout criterion "is beneficial to the listed species" – even though this standard is, throughout the vast majority of several river basins, *less protective* than the previous standard – because those waters currently exceed 20°C. Def. Br. at 34. The record does indeed indicate that water quality in Oregon is "poor" or "very poor." For example, the Klamath River generally must get cooler to meet the new 20°C standard, as it would have had to do to meet the previous 17.8°C criterion. It does not follow, however, that meeting the 20°C standard [8] in the Klamath would be "beneficial" to bull trout merely because this temperature will be *less harmful* than current, illegally high temperatures. Indeed, even Defendants' own findings do not support the Services' contention that the 20°C standard "benefits" fish. EPA determined that the 20°C Lahontan cutthroat/ redband trout criterion "is likely to adversely affect" bull trout, and in its BiOp FWS found "[t]he 20°C criterion is substantially higher than temperatures known to support viable populations of bull trout. Adverse effects to foraging or migrating sub-adult and adult bull trout from approval of this criterion can come in the form of harm through impairment of growth, reduced disease resistance, or altered behavioral patterns." NMFS 2 at 58-59. It therefore makes no sense for

---

[8] Defendants' argument also assumes that the 20°C standard would actually be met. As NWEA explains in Section III.C., *infra*, this is far from clear.

FWS to justify the 20°C criterion as somehow "beneficial" to this species, and thus determine that its adoption cannot jeopardize bull trout as a matter of law.

A Montana district court rejected nearly an identical argument to the one NMFS advances here.  In *Swan View Coalition v. Barbourletos*, No. CV 06-73-M-DWM, 2008 WL 5682094 (D. Mont. Jun. 16, 2008), the Forest Service had failed to enforce a ban on snowmobile use in a large area of Flathead National Forest.  The agency then decided to expand the areas open to snowmobiles, reasoning that its new management scheme would "benefit" threatened grizzly bears because it would result in less overall snowmobile use than was currently taking place given the agency's failure to enforce the prior snowmobile restrictions.  The court found the agency's claim unlawful under the ESA, using an apt analogy to illustrate its reasoning: "[I]f the posted speed limit is sixty miles per hour, but the state has always allowed drivers to travel at seventy miles per hour, the state cannot raise the speed limit to sixty-five miles per hour and claim that the law now makes the roads more safe."  *Id.* at *15.[9]  So too here, NMFS may not use degraded conditions of Oregon's streams – due to the fact that those waters never met the previously applicable 17.8°C standard – as the basis for comparison to conclude that weakening the standard to 20°C will nonetheless "improve" conditions for listed salmonids.

Next, in the limited circumstances where Oregon's new standards are at least somewhat more protective of fish than before, Defendants assert that the new standards are *per se* not likely to jeopardize listed species or destroy or adversely modify critical habitat.  *See e.g.* Def. Br. at 20-21 (citing *NWF v. NMFS*, 524 F.3d at 930).  This contention also does not survive scrutiny.

---

[9] *See also Friends of the East Fork, Inc. v. Thom*, 688 F.Supp.2d 1245, 1254-1255 (W.D. Wash. 2010) (Rejecting NMFS' and FWS' decision to issue an incidental take statement where the applicant "created the degraded baseline conditions" and sought "to benefit from its culpability in the degradation of [those] conditions[;]" the court reasoned "the Services should consider the state of the land *as it should have been* if [the applicant] had met its state reclamation obligations, in establishing the baseline for its analysis.") (emphasis added).

First, the facts of this case are very different from those in *NWF v. NMFS*.  That case involved the effects of a particular federal agency action, proposed dam operations, on listed salmonids.  The dam operators' proposal was simply one of many federal actions affecting fish and their habitat in the Columbia Basin – some for worse, some for better.  In contrast, EPA's approval is not simply one of many actions affecting water quality either positively or negatively; this case involves generally applicable standards that will *determine water quality throughout the state of Oregon*.  Oregon's water quality standards set the bar by which all future federal and non-federal actions are measured.  The standards will regulate all actions that affect water temperatures, limiting Oregon's authority to permit discharges of pollution, as well set the benchmarks by which to improve water quality in Oregon.  Under such circumstances, the relevant question for purposes of the ESA is not whether the water quality standards have an incremental positive or negative impact on fish and their habitat in relation to the prior standard, but whether the *biological conditions* defined by the approved standards are adequate to avoid jeopardizing listed fish, as well as adequate to avoid destroying or adversely modifying their designated critical habitat.

The Services' Handbook implementing section 7 of the ESA supports this reading of the law.  For example, the Handbook defines the state of "survival" – a term that appears in the regulatory definitions of both "jeopardy" and "destruction or adverse modification of critical habitat" – as a stable population "which exists in an environment providing all requirements for completion of the species' entire life cycle, including reproduction, sustenance, and shelter." Section 7 Consultation Handbook at 4-35 (available at http://www.fws.gov/endangered/esa-library/pdf/CH4.PDF).  Determining whether a specific water temperature or other aspect of water quality provides such an environment requires a biological assessment of what conditions

fish need, and whether the standards meet these needs, not merely a legal determination that the new standard is better than the old standard.

The ESA itself also supports this reading of the Services' duty under the statute. Section 7 requires the Services to use "best scientific and commercial data available" in making jeopardy and adverse modification determinations. 16 U.S.C. §1536(a)(2). This would be superfluous if the Services could simply declare a standard in compliance with section 7 because it was slightly better than before, regardless of the biological effects of that standard on fish and their habitat.

Finally, even the Ninth Circuit has made conflicting pronouncements on whether an action must, as a matter of law, have an adverse impact on a listed species in order to jeopardize its continued existence. In *Aluminum Co. of America v. Administrator, Bonneville Power Administration*, 175 F.3d 1156 (9th Cir. 1999) – cited repeatedly throughout *NWF v. NMFS* – the Ninth Circuit expressly rejected appellants' argument that proposed dam operations in the Columbia Basin could not be found to jeopardize listed salmon because they improved upon past operations. The court held the mere fact that a proposed action improves on the status quo "does not mean that an action agency can 'stay the course' just because doing so has been shown slightly less harmful to the listed species than previous operations. Here, the species already stands on the brink of extinction, and the incremental improvements pale in comparison to the requirements for survival and recovery." *ALCOA*, 175 F.3d at 1162 n. 6. This echoes the Services' Consultation Handbook and the ESA, indicating that section 7 requires NMFS to draw biological – as opposed to merely legal – conclusions.

In this case, therefore, the extent to which EPA's approval represents an "improvement" over previous standards or current conditions is irrelevant. Instead, section 7 requires NMFS to answer a biological question (that must be made based on the best science available): Will the

approved standards result in habitat conditions sufficient to avoid jeopardizing listed salmon and

steelhead or destroying or adversely modifying their critical habitat?

      **C.**      **NMFS Failed to Consider Cumulative Effects**

      In its brief, NMFS defends its cumulative effects analysis on the ground that "effects of

the action" will result in an improvement over the environmental baseline.  However, this

argument misunderstands the Service's own regulations, which specifically require NMFS to

assess "whether the action [specifically the 'effects of the action'], *taken together with*

*cumulative effects*, is likely to jeopardize the continued existence of listed species or result in the

destruction or adverse modification of critical habitat."  50 C.F.R. §402.14(g)(4) (emphasis

added).  Here, even assuming, *arguendo*, the "effects of the action," i.e. of adopting Oregon's

standards and exceptions, produce an improvement, that alone is insufficient under section 7.

Therefore, this court must invalidate the Services' BiOps for failing to consider cumulative

effects prior to making ultimate findings of no jeopardy.  *See e.g., American Rivers v. U.S. Army*

*Corps of Engineers*, 271 F.Supp.2d 230, 255 (D.D.C. 2003) (invalidating FWS' supplemental

BiOp for only considering impacts of Corps' action in the context of one year and failing to fully

consider cumulative effects).

      In this case, NMFS identified cumulative effects likely to adversely impact listed ESUs

and their critical habitat, including impacts from agriculture and commercial forestry.  *See*

NMFS 2 at 52.  These are likely to be very significant, and yet NMFS notes in its discussion of

cumulative effects that it "generally does not consider existing [state] rules within Oregon to be

sufficiently protective of watershed, riparian, and stream habitat functions to support the survival

and recovery of listed species." *Id.*; *see also id.* at 43 n. 6; 44 n. 7 (Oregon rules for forestry and

agriculture are insufficient for compliance with water quality standards in "many waterways").

Yet despite *identifying* these significant cumulative effects, NMFS failed to consider these "together with" the effects of EPA's approval. This oversight is plainly evident in the section of NMFS' BiOp immediately after its discussion of cumulative impacts, entitled "Integration and Synthesis of Effects." *See* NMFS 2 at 52-53. There, NMFS supposedly looked at all impacts on salmon and set forth its rationale for finding no jeopardy or destruction or adverse modification of critical habitat. However, that section contains *no* discussion of the cumulative effects NMFS identified just before. In the words of the Section 7 regulations, that section does not address the "effects of the action," i.e. of EPA's approval new standards, "together with" the cumulative effects on salmonids and their habitat due to Oregon's inadequate regulation of pollution from forestry and agriculture. *See* 50 C.F.R. §402.14(g)(4).

It is difficult to overstate the inadequacy of NMFS' analysis. The agency's overall analysis simply ignored cumulative effects which NMFS acknowledged threaten "the survival and recovery" of the listed ESUs – the very definition of jeopardy. It is thus an understatement to say that NMFS' "no jeopardy" and no "destruction or adverse modification" determinations are arbitrary in light of impacts that NMFS identified but did not consider in making its jeopardy and "adverse modification" determinations.

D.     **NMFS' Individual Conclusions for Each Criteria Contradict the Record**

1.     **Salmon and Steelhead Spawning through Fry Emergence**

NMFS concluded in its BiOp that Oregon's new 13°C criterion, intended to protect salmonid spawning through fry emergence, will "provide protective temperatures for egg incubation [4-12°C (constant) for good survival and 6-10°C (constant) for optimal survival]."[10]

_____

[10] NMFS erroneously asserts that the 13°C criterion is equivalent to the 11.5°C constant temperature for all water bodies where the criterion applies. The record indicates that it is impossible to point to any specific constant temperature as the overall equivalent of 13°C

NMFS 2 at 33. NMFS made a "not likely to adversely affect" finding for this criterion, and therefore did not assess whether this standard is likely to cause jeopardy or destroy or adversely modify critical habitat. NMFS 2 at 33.

In its brief, NMFS casts doubt on its conclusion that stream temperatures will consistently be in the ranges the agency finds necessary to avoid adverse impacts, i.e. between 4-12°C or 6-10°C. NMFS argues that salmon eggs deposited in the late summer/early fall will spend "most" of their time incubating within these temperature ranges, Def. Br. at 23, and asserts that steelhead deposited eggs in the winter or spring will spend "almost all" of their time before hatching time within these ranges. Def. Br. at 24. However, just as it would be difficult to convince someone to enter a room by assuring her that it will have sufficient oxygen "most" of the time, NMFS provides no explanation for how listed salmonids can avoid all adverse impacts by spending "most" or "almost all" of their incubation at safe temperatures.

NMFS' determination that the 13°C criterion will avoid all adverse impacts to salmon in the fall necessarily rests on an erroneous assumption that the summertime maximum temperature criterion will provide lower protective temperatures *when and where they are needed. See, e.g.* NWEA CWA Reply Br. at 26-27 (explaining why EPA's cooling assumptions are erroneous). However, there is no evidence in the record to support this assumption. Instead of citing evidence to show specific temperatures where and when spawning occurs, NMFS in both the BiOp and in its brief simply relies on broad evidence demonstrating the obvious fact that rivers cool after summer ends. In its brief, the agency points to temperature profiles for the mainstem Snake, Columbia, and Willamette Rivers to show that salmon spawning and incubation will

___

because the conversion between the two different measurement schemes depends on a particular stream's specific average temperatures and diurnal variation. *See* NMFS 275 at 20. This site-specific variation provides a good example of why NMFS must consider specific ESUs, and their geographic habitat, separately for purposes of a section 7 analysis. *See* Section I.A.

occur in declining water temperatures.  *See* Def. Br. at 23-24.  Other than demonstrating the obvious fact that rivers generally cool in the fall, the information cited by NMFS says nothing about whether the temperatures in the upper tributaries to these large rivers, where spawning and egg incubation primarily takes place, will cool to 4-12°C or 6-10°C (i.e. the temperatures NMFS recognizes as at least marginally protective of spawning through fry emergence) by the time salmon begin to spawn.  NMFS 49 at 5-42.  Moreover, NMFS has provided no citation to information in the record showing that if streams meet 13°C in the summer, general seasonal cooling will result in *all* salmon spawning waters meeting the 4-12°C or 6-10°C temperature ranges needed by spawning salmon and incubating eggs *throughout Oregon's waterways*. Without this specific evidence, NMFS has no way to scientifically conclude that these temperatures will be protective.

With respect to steelhead, NMFS asserts that water will be sufficiently cool during "much of the incubation period" in the spring, and downplays the risk that steelhead may suffer adverse effects when water temperatures get warmer more quickly.  Def. Br. at 24.  The agency cites a scientific study on ecosystem approaches to salmon conservation for the proposition that "in warmer waters, steelhead emerge earlier, limiting exposure of steelhead eggs to warm waters during incubation."  *Id*. (citing NMFS 151 at 60).   However, that very study undercuts NMFS' suggestion that early emergence from eggs can allow steelhead to avoid adverse impacts due to quickly warming waters, cautioning that "[s]mall increases in temperature at the low end of the range can substantially alter the time of hatching and emergence. . . Early emergence because of warming of water temperatures may increase exposure of fry to high-flow events and alter the natural synchrony between emergence and predator . . . or prey cycles."  NMFS 151 at 60.

These contradictions are precisely why the agency, and not its counsel, must articulate a

reasoned basis for its action within its decision-making document. It is not the job of this Court or NWEA to search for a rational connection between the record and NMFS' decision if the agency has done so in its BiOp. Counsel's "*post hoc* rationalizations" may not substitute for NMFS' own articulation of its reasoning. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (internal citations omitted). This Court should reject NMFS' "not likely to adversely affect" finding for Oregon's 13°C criterion.

### 2.    Steelhead Smoltification

Oregon declined to adopt EPA's recommendation of a 14°C criterion to protect steelhead smoltification. NMFS 275 at 31. NWEA alleged in its opening brief that NMFS made a "not likely to adversely affect" finding on that issue. Pl. Br. at 20-21. NMFS responds that it actually concluded that Oregon's decision not to adopt a steelhead smoltification standard is likely to adversely affect listed steelhead. *See* Def. Br. at 25.

Taking the agency at its word, NMFS' argument in its brief indicates a violation of the ESA more eggregious than NWEA's original claim that the record did not support a "not likely to adversely affect" finding for steelhead smoltification. When NMFS makes a "likely to adversely affect" finding, it must assess the precise impacts on listed ESUs of an action – in this case Oregon's and EPA's decision not to protect steelhead smoltification – and determine whether these impacts will jeopardize steelhead or result in destruction or adverse modification of their critical habitat. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. NMFS utterly failed to engage in this analysis; the BiOp contains virtually no discussion of how these adverse impacts affect steelhead, including their nature and extent. *See* NMFS 2 at 41, 53. The agency also made no specific finding as to whether Oregon's failure to adopt EPA's recommended criterion to protect smoltification jeopardizes steelhead or destroys or adversely affect their critical habitat.

*See id*. at 53 (discussing specific adverse effects, with no mention of adverse effects due to lack of the steelhead smoltification criterion). NMFS has therefore failed to meet its consultation responsibilities under section 7.

### 3. Salmon and Steelhead Migration Corridors Use

NMFS concurred with EPA's conclusion that this use is likely to adversely affect five listed ESUs. NMFS 2 at 37. Yet the agency provided no analysis for its "no jeopardy" determination, instead listing 6 six factors loosely supporting its conclusion. NMFS 2 at 37. Merely listing factors, however, plainly does not substitute for the reasoned analysis NMFS must perform under section 7. *See, e.g.*, 50 C.F.R. § 402.14(h)(2) (biological opinions must include "[a] detailed discussion of the effects of the action on listed species or critical habitat").

Moreover, NMFS has not shown that adverse effects will be "localized." In particular, NMFS argues Oregon's new 20°C standard *itself* will not harm listed species where "the *natural* condition is greater than 20°C[,]" purportedly the "majority of areas." Def. Br. at 25 (emphasis added) (citing NMFS 49 at 5-23). However, while NMFS provides support that "all the rivers … where this criterion applies *currently* have temperatures that exceed 20°C[,]" NMFS 49 at 5-23 (emphasis added), it has failed to show that is due to *natural* conditions. Here, NMFS has failed to support its conclusion and its approval of Oregon's 20°C standard should be set aside. *See eg*. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 528 (9th Cir. 2010) (FWS' BiOp was arbitrary and capricious in part because the Service did not "articulate a rational connection between its findings and its ultimate conclusion-that the action would not cause jeopardy").

### 4. Intergravel Dissolved Oxygen Criterion

NMFS concluded that the IGDO criterion is likely to adversely affect listed species, but will not cause jeopardy or destroy or adversely modify critical habitat because adverse impacts

will be "localized."  NMFS has not provided a reasoned explanation for this conclusion.

First, there is no indication that 8.0 mg/L will sufficiently meet biological requirements to avoid all but "localized" adverse impacts, either within an individual stream or across the state's waterways.  NMFS 2 at 32.  Within a stream, NMFS' primary accolade for this criterion is that it "will prevent *high mortality* of salmon and steelhead embryos and alevins …."  NMFS 2 at 32 (emphasis added).  Indeed, one field study NMFS cites concluded that *only half* of rainbow trout embryos survive at the 8.0 mg/L IGDO concentration.  NMFS 2 at 31.  Other cited studies indicate *survival is negligible* when IGDO falls below 8.0 mg/L. NMFS 2 at 31.  And NMFS points to only a single study in which a healthy majority of juvenile trout survived at 8.0 mg/L. NMFS 2 at 31.  NMFS also admits "IGDO thresholds cannot conclusively be established for Pacific salmon and steelhead" and "[a]lso lacking are baseline data on ambient IGDO within natural and impaired spawning sites."  NMFS 2 at 32.  In all, NMFS' conclusion that 8.0 mg/L will result in only "localized" adverse impacts at the stream level, even if consistent with its bare assertion it will not cause "high mortality," is not supported by the record.

Second, NMFS in its BiOp cites to no information whatsoever to indicate that the 8.0 mg/L will have only "localized" adverse impact considering Oregon's many diverse waterways.  Seeking to supply a post-hoc rationale for NMFS' reasoning, agency counsel asserts that "many streams" in Oregon have localized areas of groundwater upwelling that hold greater concentrations of dissolved oxygen.  *See* Def. Br. at 27 (citing NMFS 139 and 262, but providing no page citations).  While one source, NMFS 262, discusses a variety of stream characteristics in the Grande Ronde Basin, these general citations provide no evidence that the IGDO criterion of 8.0 mg/L will result in only "localized" impacts across the state due to widespread groundwater upwelling in Oregon streams.

Finally, even if for the sake of argument 8.0 mg/L is a sufficient metric to result in only "localized" adverse impacts in streams across the state, NMFS fails to explain in its BiOp what "localized" means, the extent of these expected "localized" adverse impacts on listed ESUs, and why these "localized" adverse effects will not rise to the level of jeopardy for all ESUs, and avoid destruction or adverse modification of all designated critical habitat.  NMFS 2 at 32, 53.

In short, NMFS' BiOp contains no analysis of what the expected adverse impacts will be for this criterion, how extensive these impacts are likely to be, and why those impacts do not rise to the level of jeopardy or destruction or adverse modification of critical habitat.  When the appropriate IGDO thresholds, as well as the extent and effects of these impacts, are inconclusive, NMFS must not gamble with the fate of listed species.  *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) ("Congress clearly intended that [agencies] give 'the highest of priorities' and the 'benefit of the doubt' to preserving endangered species…..").  NMFS' IGDO finding is arbitrary.

**IV.    The Record Does Not Support FWS' No Jeopardy Findings**

> **A.    FWS' Arbitrarily Concluded the 12°C Criterion Will Not Adversely Affect Bull Trout**

FWS interprets the section 7 threshold for "adverse affect" on bull trout as a very sensitive standard, noting that "if take occurs of even <u>one</u> embryo [referring to egg incubation requirements], its got to be considered an adverse effect." FWS 293 at 07911. The agency's definition of take, in turn, is an action that causes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding." 50 C.F.R. § 17.3 (definition of "harm" in statutory definition of "take"). In the spawning and rearing context, therefore, water conditions likely to result in death or impairment of even one bull trout embryo must be considered an adverse effect. The record does

not support FWS' finding that Oregon's 12°C criterion for bull trout spawning and rearing will be sufficient completely avoid adverse effects across Oregon.

Somewhat remarkably given the ample information in the record to the contrary, FWS begins its argument by asserting that bull trout spawning may not suffer even at temperatures above 9°C. *See* Def. Br. at 28. However, FWS in its BiOp declared that "the temperature that has been determined in the scientific literature to be protective of bull trout spawning is 9°C…." FWS 2 at 00155. While bull trout may *begin* to spawn at temperatures at or slightly higher than 9°C, the record indicates that temperatures continue to decline for the duration of spawning activity. FWS 137 at 01191. The study FWS cites to support the contention that bull trout spawning occurs at temperatures over 9°C (*see* Def. Br. at 28) also concluded that the majority of spawning occurred below 9C°, and the study acknowledges the probability that the 9C+ spawning was likely associated with hyporheic upwelling, causing the temperatures at spawning sites to be cooler than measured reference sites. FWS 137 at 01194; *see also* FWS 2 at 00128. FWS similarly misrepresents the conclusions of other cited sources, claiming that 9°C represents an acceptable spawning temperature when the studies actually report that in most areas spawning "begins when temperatures fell below 9°C," FWS 179 at 01809; FWS 188 at 02192. Moreover, early spawning in water at or near 9°C is not likely to be successful; FWS in its BiOp discusses a study finding 0-20% survival of bull trout eggs in water between 8-10°C, with the survival rate improving dramatically as the temperature drops closer to the 2-6 °C range. *See* FWS 2 at 00156; FWS 179 at 01809. In sum, the record clearly indicates that temperatures above 9°C have adverse effects on bull trout spawning.

In its opening brief, NWEA noted that a standard based on a summer maximum of 12°C would of course not protect bull trout that spawn in the summer. *See* NWEA Opening Br. at 24-

26. FWS responds that the Protecting Cold Water (PCW) narrative criterion will protect waters colder than 12°C that "naturally occur" in areas where bull trout spawn in the summer. Def. Br. at 29. While FWS points to evidence in the record showing that such waters actually exist in the Metolius and McKenzie Rivers, it also asserts that "[i]nformation on every place where the [PCW] criteria would apply is not required." *Id*.[11] This is a remarkable argument that borders on the surreal. The agency necessarily suggests that waters colder than 12°C not only exist in the five other basins (*see* FWS 42 at 00799) where bull trout spawn in the summer – despite *zero evidence* in the record indicating this the case – but that the PCW criterion will protect these hypothetical cold waters even though no one knows where they are located. FWS maintains it "must" assume that Oregon will use its authority to protect cold water (Def. Br. at 29), but fails to explain how the state will do so without any information indicating that water 9°C or colder actually exists in the summer outside the Metolius and McKenzie Basins, and without any inkling as to where these cold waters are located if they indeed are present at all. Therefore, FWS' argument that the PCW criterion protects summer bull trout spawners outside the Metolius and McKenzie Basins is the legal equivalent of fairy dust.

With respect to bull trout populations that begin to spawn somewhat later in the year, the record does not support FWS' claim that "if the summer maximum temperature is 12°C, temperatures will naturally decrease to levels that are protective of bull trout spawning (9°C) that occurs in late summer and early fall…." FWS 2 at 00155-56.  FWS comprehensively applies this assumption to streams throughout "Oregon bull trout waters." *Id*. FWS' BiOp cites no information in the record to support this state-wide cooling, instead relying on "best professional

---

[11]     The record demonstrates that FWS has little to no ability to accurately locate or identify cold water refugia that it assumes will shield bull trout spawning in the summer from exposure to the otherwise unprotective 12°C degree criteria. *See* NMFS 163 at 14.

judgment." *Id.* at 00155. In a *post hoc* effort to identify support in the record for FWS' broad cooling assumption, counsel for FWS points to studies indicating that stream temperatures generally cool as summer ends. *See* Def. Br. at 29. However, observed seasonal temperature drops of 3°C or more occurred within streams that experience summertime highs around 20°C; FWS points to nothing in the record indicating that streams with summertime maxima meeting the much lower 12°C standard in the summer are likely to experience temperature drops of a similar magnitude. To the contrary, there is evidence from the Imnaha study suggesting that cooling tends in streams are much slower when temperatures are closer to 12°C. *See* FWS 142 at 01337, 01339, 01369, 01370, 01375.

Most tellingly, data cited by NMFS also show that many streams experience cooling of less than 3°C from their summer highs to observed temperatures in September. *See id.* at 01330, 01333, 01334, 01335, 01345, 01370, 01371, 01375 (cooling less than 3°C in Imnaha Basin streams from summer maxima to observed temperatures in early to mid September). Similarly, in the John Day Basin, the record shows that only two of 15 streams had cooled by 3°C from their summer highs at the beginning of September. *See* FWS 140 at 01230, 01236. This data completely undercuts FWS' cite to "best professional judgment" for the proposition that all streams throughout Oregon will cool from 12°C summer maxima to 9°C or less as bull trout spawning begins. Moreover, the variability in cooling trends across the streams cited in studies in the record demonstrates the implausibility of NMFS' assumption that streams within bull trout habitat *across the state* will uniformly cool at least 3°C to drop from the allowable 12°C maximum in the summer to the 9°C threshold FWS identifies as protecting bull trout spawning and rearing.

FWS also justifies its approval of the 12°C criterion by assuming that this standard applies "throughout the water body, including its lowest downstream extent," the waters upstream will necessarily be cooler. FWS 419 at 09102.  However, the record contradicts this assumption.  While rivers sometimes warm as they flow downstream, the record demonstrates rivers can be either highly variable or flat and may not, in fact, be uniformly cooler upstream. EPA 114 at 014035 (showing, in Fig. 11, significant cooling and heating along 95 miles of the mainstem Grande Ronde, with temperature actually *dropping* before its lowest downstream extent); EPA 286 at 020090 (demonstrating estimated natural temperatures in the Kilchis and Wilson Rivers are near flat and *drop* towards mouth).  Not only do these data show FWS' assumption to be unsupported, but Oregon's rule contains nothing to *ensure* upstream locations are, in fact, cooler.

Finally, the Service's assurances to the contrary, the record suggests that FWS considered factors beyond "the best scientific . . . data available" (16 U.S.C. § 1536(a)(2)) in assessing EPA's adoption of the temperature criterion for bull trout spawning and rearing. In its brief, the agency attempts to brush aside comments by its officials that acknowledging that an 11°C policy was required "for full protection" of bull trout, but that "science and the real world must be blended to make policy" (FWS 581 at 10906), as well as declaring that "12°C as a guidance for criteria development is pushing the upper temperature limit farther than we can support." FWS 572 at 10887.  While FWS in its brief notes that agency officials did not close the door to the possibility that a state could develop standards that could make 12°C protective of bull trout spawning and rearing (*see* Def. Br. at 32), NWEA has demonstrated that Oregon did not accomplish this feat. However, FWS stuck with the political compromise it struck with EPA in crafting Temperature Guidance, and found this standard does not adversely affect bull trout.

For the reasons set forth above, FWS' finding was arbitrary.

**B.      The Record Does Not Support FWS' Assertion That the 20° C Lahontan Cutthroat Trout and Redband Trout Criterion Is Not Likely to Jeopardize Bull Trout**

FWS found that the proposed 20°C Lahontan and Redband Trout criterion is likely to adversely affect bull trout, but not likely to jeopardize their continued existence. However, the agency justifies this finding by citing the common refrain that these adverse impacts will be of a limited "magnitude, duration, and extent." FWS 2 at 00163.

The record virtually no analysis or reasoning to support the conclusion that this 20°C standard will have limited adverse impacts on bull trout; indeed, FWS acknowledged that it "cannot make a precise determination as to the extent of the river miles that may adversely affect sub-adult and adult foraging and migrating bull trout…." FWS 2 at 00163. Agency counsel provide *post hoc* reasoning such as that waters are "likely cooler than the maximum during September through May, the times when the bull trout migrate through them," and FWS' assumption that water temperatures will be supportive of bull trout migration in May was "logical." *See* Def. Br. at 33. However, piecing together *post hoc* biological rationales based on inferences that lack clear support in the record is not consistent with the Service's duty under section 7.[12] *See NRDC v. Daley*, 209 F.3d 747, 755-56 (D.C. Cir. 2000) (NMFS failed to cite to meaningful data or "well founded predictions" or conduct analysis to demonstrate that increasing mesh size of nets would reduce number of undersize fish caught).

**V.      The Services' Incidental Take Statements Are Unlawful Because They Contain Invalid Triggers For The Re-Initiation Of Consultation**

In July 2010, the Services sought a remand of their Incidental Take Statements (ITSs),

---

[12] FWS mischaracterizes NWEA's concerns as limited to the Klamath Basin (Def. Br. at 33), when Plaintiff merely emphasized that application of this was most critical in this basin. *See* NWEA Opening Br. at 30.

acknowledging that the ITSs were inconsistent with *Or. Nat. Res. Council (ONRC) v. Allen*, 476 F.3d 1031 (9th Cir. 2007), which this Court denied. *See* Docket Nos. 224-27, 248. Though the Services continue to acknowledge the legal infirmities in the ITSs (Def. Br. at 35, n.10), they now claim the Court should deny NWEA's motion for summary judgment based on the sufficiency of NWEA's pleadings. This Court should reject this argument; NWEA's complaint more than adequately pleaded claims against the biological opinions and included ITSs.

NWEA's repeated reference to the Services' ITSs in its complaint gave the Services fair notice[13] that NWEA intended to rest its claims against the BiOps at least in part on the deficiency of the ITSs. Importantly, in its "Prayer for Relief" NWEA explicitly requested that the Court set aside both the BiOps and "accompanying incidental take statement[s]," and order the Services to rescind their respective BiOps and "accompanying incidental take statement[s]." Docket No. 5 at 70. Further, NWEA's complaint included numerous other references to the ITSs. *See id*. at 4, 16, 45, 50. Thus the Services' contention regarding "an absence of a claim against the ITSs" (Serv. Br. at 35) is baseless.

The Services fault NWEA for not making a *separate* claim for relief against the ITSs because "an ITS is not part of the Services' jeopardy or adverse modification analysis." Def. Br. at 34-35 (citing *Ariz. Cattle Growers Ass'n v. FWS*, 273 F.3d 1229, 1239, 1242 (9th Cir. 2001)). The Services misinterpret *Ariz. Cattle Growers*. Although an ITS follows a BiOp's jeopardy and adverse modification determinations, the ESA itself closely links these two elements.

---

[13] FRCP 8(a) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" *Erikson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting FRCP 8(a) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). After *Erikson* and *Twombly,* the Ninth Circuit has reiterated that Rule 8's liberal notice pleading requirements remain intact, and courts must not impose heightened pleading standards beyond Rule 8's liberal notice pleading requirements unless explicitly required by statutes or rules. *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 841-842 (9th Cir. 2007).

Section 7(b)(4) provides that the Services may authorize incidental take only to the extent that the take does not violate the section 7(a)(2)'s prohibitions against jeopardy and destruction or adverse modification of critical habitat. *See* 16 U.S.C. §1536(b)(4)(A); *Ariz. Cattle Growers* 273 F.3d at 1242 ("consistent with the language of the statute, the regulations only require the issuance of an [ITS] when the resultant incidental take of listed species will not violate section 7(a)(2)") (internal emphasis omitted). Due to the express statutory links between an ITS and the Services' findings under Section 7(a)(2), NWEA's claims for relief against the Services' BiOps under Section 7(a)(2) (with numerous references to the ITSs) satisfy Rule 8's liberal notice pleading requirements. *See also Cold Mountain v. Garber*, 375 F.3d 884, 888 (9th Cir. 2004) (finding that the FWS issued an ITS "as part of the BiOp"); *ONRC*, 467 F.3d at 1036-37 (explaining the connection between the BiOp and ITS; and noting that the Services' regulations require the Services to provide an ITS "with the biological opinion").

Further, NWEA was not required to amend its complaint to include a citation to the *ONRC v. Allen* decision. Of course, complaints need not cite to case law at all. *Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004). Moreover, the *ONRC v. Allen* decision simply affirmed the meaning of the Services' regulations, which NWEA *did cite* in its complaint. Docket No. 5 at 16, 50. The Court should firmly reject the Services' pleading arguments and enter summary judgment in NWEA's favor against the ITSs.

## CONCLUSION

For the above reasons, NWEA respectfully requests that this Court set aside both FWS' and NMFS' respective biological opinions, as well as their associated incidental take statements, and remand to the Services with orders to complete lawful Section 7 consultations and incidental take statements.

Dated the 25th day of February, 2011

Respectfully Submitted,


**/S/ DANIEL J. ROHLF**

Daniel J. Rohlf

Allison LaPlante

Daniel Mensher,

Counsel for Plaintiff